No. 3168

Second Circuit

---

BAILEY v. GIFFORD SAND & GRAVEL COMPANY

---

(February 3, 1928. Opinion and Decree.)

---

(*Syllabus by the Editor*)

1. **Louisiana Digest—Master and Servant —Par. 159.**

Injured employee suing for compensation under Section 8, Subsection 1 (b), of the Employers' Liability Act No. 20 of 1914, as amended by Act 216 of 1924, is entitled to sixty-five per cent of his wages during disability not beyond four hundred weeks where the evidence shows that he was totally disabled to do work of reasonable character as a result of an injury to his skull and brain, necessitating a removal of a portion of the skull and brain, causing nervousness and partial paralysis of the right side.

2. **Louisiana Digest—Master and Servant —Par. 159, 159 (a), 160 (j).**

Where the evidence of physicians, in a suit for compensation, under the Employers' Liability Act No. 20 of 1914, Section 8, Subsection 1 (b), as amended by Act No. 216 of 1924, is such that whether the disability is temporary or permanent cannot be definitely determined at the time of the trial, judgment should be given for sixty-five per cent of the wages during disability not beyond four hundred weeks.

(Editor's note—The recent amendment of Act 20 of 1914 is Act 85 of 1926.)

Appeal from the Ninth Judicial District Court of Louisiana, Parish of Rapides. Hon. Leven L. Hooe, Judge.

Action by Harvey C. Bailey against Gifford Sand & Gravel Company.

There was judgment for defendant and plaintiff appealed.

Judgment amended.

Huey P. Long, George T. McSween, of Shreveport, attorneys for plaintiff, appellant.

Thornton, Gist &· Richey, of Alexandria; Spearing, Miller & Mabry, of New Orleans, attorneys for defendant, appellee.

ODOM, J.   This suit is for compensation under Act No. 20 of 1914 and amendments, not including Act No. 85 of 1926.

Plaintiff, while at work for defendant, fell a distance of some six or eight feet, striking his head against a piece of iron which passed through the left ear and penetrated the skull in front of and above the ear.

The brain itself was punctured and a small portion of the brain tissue escaped through the opening.   Surgeons removed fragments of the skull and reunited the tissues.   There was left in the skull a hole about the size of a fifty-cent piece. The outer skin has healed over the wound, but the hole in the skull is still there.

He was injured on December 13, 1925, and was carried to a sanitarium where he remained fifty-three days.   During a good portion of the time he was unconscious.

He brought this suit on May 24, 1926, alleging permanent total disability to do work of a reasonable character, and he asks full compensation for four hundred weeks.

The defense is that he has fully recovered.

The lower court allowed full compensation for a period of twenty-seven weeks.

Plaintiff appealed.

OPINION

Admittedly plaintiff's injury arose out of and in the course of his employment.

The only question presented, therefore, is whether the disability resulting from the injury is partial or total, and, in either event, whether it is temporary or permanent.

A reading of all the testimony has convinced us that at the time of the trial, on January 18th, 1926, about six months after the injury, plaintiff was unable to do manual labor of a reasonable character, such as he was accustomed and capacitated to do, and that in all probability his disability is permanent.   At any rate, the court cannot, with any degree of certainty, fix the period over which his disability will continue.

But for the earnest argument of counsel for defendant and the elaborate brief filed by them, we would be disposed to pass the case without an extended discussion of the facts.   However, we shall go into detail as to our reasons for the conclusion which we have reached.

Plaintiff is a carpenter by trade and was employed by defendant at a daily wage of $3.50, working regularly.   He is thirty-one years old and up to the date of the injury was healthy and strong.   He had good capacity, both mental and physical, for the work he followed.   No defect, mental or physical, had developed.

On December 13th, 1925, he was working on a pipe-line and fell a distance of some

six or eight feet, and struck his head upon a piece of iron which penetrated his skull. Dr. F. M. Letts, a physician and surgeon, who attended him immediately, thus decribes the wound and his treatment:

"This wound was a puncture wound through the skull, making an irregular, almost round hole, from which three or four fragments of bone were removed; the size of this opening was approximately the size or a little less than the size of a half dollar. The covering of the brain had an 'L' shaped tear, from which a small amount of his brain substance had escaped; all these fragments were taken out and the edges of the brain covering brought together, on which was placed a small sterile pact saturated with mercurochrome, the torn area in the bone covering closed with the exception of the small area of skin which had previously been in size about an inch and a half upward. The patient was put to bed. He was admitted on December 13th and allowed to go to his home about February 4th."

Dr. Letts' attention was called to the fact that other physicians had testified that the wound was in the rolando area of the brain and that as a result the left motor cortex was damaged, and was asked if in his opinion there was injury to such portion of the brain, and he said the injury was not over the rolando area but was from one and a half to two inches from that area, and that the injury was not over the motor area of the brain.

The location of the injury to the brain is highly important, due to the fact that plaintiff contends that his right arm and right leg are partially paralyzed, which would follow as a result of an injury to the motor area of the brain on the left side. We shall revert to this point later in this opinion.

Now, as to plaintiff's condition at the time of the trial. He testified that:

"I have been awfully weak and I can hardly stand up. My mind is a little off and I can't remember much. * * * When I get warm I have headaches and my head hurts on the side pretty nearly all the time. * * * I can hardly sleep at all. Pretty good strength in the left hand but not on the right."

And he said that applied to the whole right side, his leg, arm and shoulder; that his right shoulder is slightly drooped down; that he was not able to work, and that about all he had done was to carry in stovewood for his wife.

His wife testified that he remained unconscious for five weeks after the accident, and asked as to his present condition she said:

"Well, he is just nervous, and he cannot hold his temper, he just can't hold his temper."

She said he does not sleep well at night.

Mr. J. F. Smith testified that he was well acquainted with plaintiff, who had worked for him; that plaintiff was one of his leading men and—

"he was the best man that I had, he was good in his head work. * * * I could risk him out in dangerous places."

And he was asked:

"Would you be willing to risk him now on overhead work?"

And he answered:

"No, sir, and no other job."

Plaintiff admitted, on cross-examination, that since he was discharged from the hospital he had made no effort to work, giving as his reason that he was not able to work due to his nervousness and the weakened condition of his body. He admitted, on cross-examination, that he had made repeated trips from his home to Lecompte, a

distance of about nine miles, and that he walked until he could catch a ride. Whether he ever walked the entire distance or not is not disclosed by the record but we infer that he probably had.

Now, as to his condition as viewed by the physicians.

Defendant called Dr. F. M. Letts of Lecompte and Dr. R. O. Simmons of Alexandria.

Dr. Letts treated him and saw him last about May 9th, a month before the trial. He said when he discharged him his muscles were soft and he was not in condition to do hard work and he did not want him to try to work for several months after he was discharged in February; that he later advised him to do light work, and he was asked:

"Had he started to perform light work when you told him that he could do light work; could he do hard manual labor now?"

And he said:

"Most probably he would be in a position to do quite a bit of hard manual labor at this time, and more as time rolls by."

His testimony was taken on June 18th, six months after the date of the injury. He said his reflexes were normal, that there was no shrinking of the parts, and that mentally he was sound. However, his examination dated back to February 4th when the patient was discharged from the hospital.

Further on in his testimony he was again asked if plaintiff should be able to work, and he said:

"By this time I think he should be able to do a fair amount of labor."

After saying that on May 15th plaintiff should be able to do light work, he was asked what he meant by light work, and he said:

"Well, anything where there was not very much manual labor connected with it."

Dr. Simmons, the other physician called by defendant, was asked if plaintiff should be able to work after five months, and said:

"I think so, if it is light work. * * * I think he is able to do light work. I don't think he is able to do ordinary manual labor because his muscles are very soft, and from what I can learn he has not attempted to do any work."

He said that in considering this case, one must take into consideration the man's "mental condition, his fear of having a permanent injury, his fear of never being able to work again or to perform his duties as he had in the past; all these things possibly interfere with the man's sleep; in other words, a man can think he has a condition and he may not have it."

And he was asked:

"That would be nearly as bad as having the condition, would it not, doctor?"

Answer:

"Well, it would be pretty bad, I will admit."

Plaintiff could, we think, well afford to rest his case upon the testimony of these two physicians.

If we adopt defendant's theory of plaintiff's condition as related by Dr. Letts, his compensation could not be cut off at the end of twenty-seven weeks, because Dr. Letts says that if plaintiff had done what he suggested, that is, undertake light work,

*"most probably* he would be in position to do quite a bit of hard manual work at this time, and more as time rolls by."

And says:

"By this time (the date of the trial) I think he should be able to do a *fair amount* of labor."

According to this, plaintiff had not recovered, at the time of the trial, six months after the injury.

Dr. Simmons seems to think that plaintiff's mental condition has something to do with his physical condition; and that is probably true, but we cannot overlook the fact that it was the injury which brought on the mental condition and was, therefore, to say the least, the indirect cause of the disability.

Referring now to the testimony of Dr. Cassity, Dr. Kerlin and Dr. Sanderson, all of Shreveport, called by plaintiff, we find them unanimous in the opinion that plaintiff is incapacitated to do work of a reasonable character. They examined him about May 13th, 1926.

Dr. Cassity said he found a hole in the bone above the left ear about the size of a fifty-cent piece, the muscles of the neck and right side weak, pulse above normal, right arm and right leg about twenty five per cent weaker than the left. In addition to these, he found a number of subjective symptoms such as headaches, dizziness, weakness and pains in the region of the injury. He stated that he had to rely upon the statement of plaintiff as to the headaches, dizziness, etc., yet he was reasonably sure that he was so afflicted, because such conditions usually follow an injury of this kind. He says plaintiff has post-traumatic neurosis. He says the injury—

"is rather along in the portion of the brain called the fissure of Rolando, and in that region most of the centers of motion, the arms and the muscles of the body and the legs, are situated, and injuries in that region cause disability from decreased motion due to paralysis of the various parts."

He says:

"I find that one whole side of his body is markedly weaker than the other side. That shows that there has been either hemorrhage in that brain or traumatization of the brain tissues fairly wide spread."

He says such conditions cause concussion of the brain.

"We know the prominent symptoms of concussion of the brain are headache and dizziness; therefore we reason that with actual proof of the fact he has partial paralysis of one side of the body, his story that he has headaches and dizziness is a very reasonable symptom for him to have."

He was asked:

"Have you any doubt as to whether this man is a faker?
"A. No, not in my conscience at all.
"Q. You don't think he is a faker, do you?
"A. No, sir, I don't."

Dr. Sanderson described the wound and he found the man's general condition fair as to color and general appearance— "but he appears to be very nervous. * * * You can feel a pulsation over this softened area. * * * His hearing is very defective in the left ear. * * * There is apparent weakness in the right arm and leg. He complains of nervousness, headaches, dizziness and symptoms of a nervous nature. * * * Assuming the history of the injury is true and this opening in the skull was due to the injury or an operation following the injury, it is reasonable to suppose, and naturally follows that there was injury to the cortex of the brain in that region."

Asked if the plaintiff, when he examined him on May 15th, was able to resume normal labor such as he had been doing, he said he was not and expressed the opinion that his disability was permanent. He

said he thought all such patients exaggerated their symptoms, but said:

"This man impressed me as not being consciously exaggerating."

Dr. Kerlin diagnosed his condition as being:

"Post-traumatic neurosis, injury to the left motor cortex of the brain."

He says he is partially paralyzed in the right side, and said:

"The man's mentality is actually impaired."

Asked if he could do manual labor when he examined him, he said:

"He was unable to do any work—absolutely incapacitated."

Asked if, in his opinion, he would ever be able to labor, he said:

"I don't believe he will. Of course, I would not be dogmatic and say that man would never be able, but I say the chances are that man will be impaired for years from doing any hard physical or mental labor."

He said he would not be able to hold work "from both physical and mental standpoint".

Our findings, therefore, are that the plaintiff, at the time of the trial, was totally disabled to do work of a reasonable character. Whether that disability is temporary or permanent, cannot be definitely determined at this time. The opinion of some of the physicians is that plaintiff is permanently incapacitated. Giving the employee the benefit of the doubt and of a liberal construction of the statute and the testimony, we think his compensation should be fixed under paragraph (b) of subsection 1 of section 8 of Act No. 20 of 1914 as finally amended by Act No. 216 of 1924, which is sixty-five per cent of wages during disability, not beyond four hundred weeks.

For the reasons assigned, it is ordered, adjudged and decreed that the judgment appealed from be amended so as to read as follows:

It is ordered, adjudged and decreed that plaintiff, Harvey C. Bailey, have and recover against defendant, Gifford Sand & Gravel Company, compensation at the rate of fifteen and 92-100 dollars per week as for total disability, during disability, for a period not exceeding four hundred weeks, dating from December 20th, 1925, subject to a credit of three hundred and thirty-four and 32-100 dollars, or twenty-one weeks' compensation already paid; each payment to bear interest at five per cent from the date due until paid; defendant to pay all costs.

It is further ordered and decreed that the contract between plaintiff and his attorneys, attached to and made a part of the petition, be recognized and enforced.