No. 3423

Second Circuit

## COLQUETTE v. LOUISIANA CENT. LUMBER CO.

(January 21, 1929. Opinion and Decree.)

Julius T. Long, of Shreveport, attorney for plaintiff, appellee.

Thornton, Gist & Richey, of Alexandria, attorneys for defendant, appellant.

REYNOLDS, J. This is a suit under the Workmen's Compensation Act (Act No. 20 of 1914, as amended). The plaintiff is the widow of Robert G. Colquette, deceased, and seeks judgment against defendant for $15.47 a week for 300 weeks, beginning November 17, 1927, with legal interest on each installment from its maturity until paid, and for the further sum of $150, as and for burial expenses of the deceased and contingent expenses connected therewith. She alleged:

"That her husband, Robert G. Colquette, while in the employ of and working for the said Lumber Company, at Clarks, in Caldwell parish, Louisiana, for the daily rate of pay of three dollars and forty cents, seven days in the week, at the sawmill being then and there operated by said company, on November 27, 1927, while working in the engine room at night in connection with the operation of said engine, his right foot was caught and injured by the fuel chain therein, being seriously and permanently injured, bruised, and the tissues and bones in his leg so seriously and permanently injured and impaired, that the said injuries caused and brought about his death on February 14, 1928. That on account of said injuries, the deceased was not able to do any work of any character .from the date of his injuries until he died. That, because of said injuries, the bones in his foot and leg and ankle, the nerves, blood vessels, muscles, ligaments and tissues in those parts, became so infected, impaired and diseased

that his heart, lungs, nerves throughout his body, kidneys and other parts of his body, became infected and seriously impaired, all materially aiding in his death and bringing same about. That his condition and injuries constantly grew worse from the time he was injured until his death. That, at the time of his death, the bones of his leg and foot were seriously and permanently diseased and impaired. That the said injury he received while thus working for said company was the direct cause of his death and produced and brought about any ailments or troubles he may have had when he died."

She further alleged that she had incurred or assumed expenses amounting to $150 in connection with the death and burial of her husband.

She further alleged that the defendant had paid to the deceased compensation of $13.26 a week from the time of his injury until his death, and that it is entitled to credit for such payments.

The defendant admitted that the deceased was injured while in its employ and that he was earning $3.40 a day, but denied that there was any causal connection between the injury and his death, and averred that his death was due to natural causes.

It further alleged that before his death it had paid the deceased as compensation for eight weeks $123.76, and that after his death it had paid to plaintiff $48.62 as the balance of compensation owing to the deceased at the time of his death.

On these issues the case was tried, and there was judgment in favor of the plaintiff and against the defendant for $6.63 a week for not exceeding 300 weeks, beginning February 14, 1928, with legal interest on each installment from its maturity until paid, less the amount of compensation paid by the defendant to the deceased, and for the further sum of $150 as and for burial expenses of the deceased.

The fees of the medical experts who testified in the case were fixed at $15 each.

From this judgment, the defendant has appealed.

The plaintiff has answered the appeal, and asks that the judgment be amended so as to—

(1) Fix the fees of the medical experts Sanderson, Rigby, Ragan, Johnson and Corry at $20 each, and tax such fees as part of the costs of suit.

(2) Fix the period during which compensation shall be paid at 300 weeks, dating from November 27, 1927, the first payment to be due as of February 14, 1928.

(3) Increase the amount of the weekly payment from $6.63 to $7.73.

## OPINION

Plaintiff's husband was injured on November 27, 1927, and died on February 14, 1928. She contends that the cause of the death was blood poisoning superinduced by the injury. Defendant contends that the cause of the death was pneumonia, and that there was no causal relation between it and the injury. And the question for our determination is whether the death was the result of the injury or due to natural causes.

Dr. S. G. Hines testifies that he treated the injury of the deceased about an hour after it occurred.

"Q. What was the condition of his foot at that time?
"A. There was a slight amount of swelling—not very much at that time. He complained of no pain.
"Q. In what part of his leg was the swelling?
"A. In his right foot and ankle.
"Q. Were there any lesions or broken places in the skin?
"A. No, sir.

"Q. What treatment did you prescribe?

"A. Rest of the foot and local applications. Hot compresses and things like that, and anodynes to relieve him.

"Q. When did you see him at any time after that?

"A. I am not sure whether it was the morning following the injury or the second morning following the injury.

"Q. What was the condition at that time?

"A. There was quite a bit of swelling and ecchymosis.

"Q. Did you see him at any time after that, doctor, before his last illness?

"A. Yes, sir. I saw him at the Oasis.

"Q. When was that?

"A. Saturday morning previous to his death.

"Q. Where is the Oasis?

"A. Down town.

"Q. At the post-office, the post-office in the same building?

"A. Yes, sir.

"Q. How far was that from his home, doctor?

"A. About the distance of four blocks.

"Q. Was he walking on crutches or without crutches?

"A. He was sitting down, talking to his brother, when I saw him.

"Q. Did you see any crutches?

"A. I did not see any.

"Q. Did you say anything to him, or him to you, about his foot, that day?

"A. No, sir.

"Q. Did you visit him or prescribe any treatment for him or call for his account, on account of the injuries to his foot, after the first or second day after the injury?

"A. On Monday night, or it was really Tuesday morning, about 3:00 o'clock, before he died.

"Q. You called at 3:00 o'clock and he died at 9:30?

"A. Yes, sir.

"Q. What did you find when you got there?

"A. I found him delirious, trying to get out of bed. He had a temperature of 103; pulse 125.

"Q. What was the condition of his lungs?

"A. There was quite a bit of bronchial breathing.

\* \* \* \* \* \*

"Q. Did you stay with him until he died, or how long did you stay, doctor?

"A. I was there possibly two hours and fifteen minutes, or something like that. I stayed quite a while to get him relieved.

"Q. What diagnosis did you make of the case at that time?

"A. A bad heart and pneumonia.

"Q. From the history they gave you and the condition you found him in after making the examination, you testify that the cause of his death was pneumonia?

"A. Yes, sir; superinduced by a bad heart.

"Q. That caused his death?

"A. Yes, sir.

"Q. Did that injured foot have anything to do with his death?

"A. I don't think."

Dr. Fred Hecom testified:

"Q. Did you know the deceased, R. G. Colquette, the husband of the plaintiff in this case?

"A. Yes, sir; I knew him.

"Q. Did you have occasion to treat his injured foot, following an accident in November, 1927?

"A. No, I did not treat it; I examined it.

"Q. About when did you examine it?

"A. Several days after he sustained the injury I went to his house to make an examination of his injured foot for the purpose of putting him on compensation pay.

"Q. What did you find his condition to be at that time?

"A. I found that he had a contused right leg.

"Q. At what point?

"A. In the region of the ankle, just above the ankle.

"Q. Was the skin broken anywhere, doctor?

"A. It was not.

"Q. Just an abrasion?

"A. I call it a contusion. I think the ligaments were wrenched. There were no cuts at all.

"Q. The skin was not broken?

"A. No; no cuts at all.

"Q. It was what we call a sprained ankle?

"A. A sprained ankle is a very good term.

"Q. What is the treatment for a sprained ankle?

"A. Rest.

"Q. That is what you advised in this case?

"A. Yes, sir.

"Q. Did you see Mr. Colquette at any time after that before his last illness?

"A. I did.

"Q. What time?

"A. I met him on the street on Friday previous to his death on Tuesday, and also met him on the street on Saturday before his death on Tuesday, and previous to those two times he came to my office once.

"Q. When he came to your office, was he walking on crutches?

"A. When he came to my office he was.

"Q. What was he doing on Friday and Saturday before his death when you saw him on the street?

"A. On Friday, he was in the middle of the street in front of the boarding house, what we call the "Blue Goose." He was on his way home, then, and said he had been over there sitting on the gallery talking.

"Q. Was he walking on crutches at that time?

"A. He had no crutches.

"Q. Where did you see him on Saturday?

"A. At the Oasis.

"Q. Was he walking on crutches at that time?

"A. He had no crutches at that time.

"Q. Did he make a statement to you about the condition of his leg?

"A. Yes, sir. He said he was in better condition than he had been in a long time, and said he was going back to work soon.

"Q. Did you visit him during his last illness?

"A. Yes, sir.

"Q. What was his condition then?

"A. He had pneumonia in both lungs.

"Q. There has been some evidence relative to the fact that he did not spit up anything? ·

"A. I found both lungs congested; both lungs consolidated; suffering from dysentery, a rapid pulse and comatose condition. Both lungs consolidated.

"Q. How did you ascertain that?

"A. By the use of a stethoscope.

"Q. No doubt about that condition, doctor?

"A. There was not.

"Q. There has been some testimony to the effect that this man possibly died from septic poisoning. Do you agree with Doctor Johnson, that septic poison is caused by a germ, that must get into the injury from outside?

"A. Septic poison might come from a number of different ways; the germs may enter the system from a different manner.

"Q. Where you get septic poison from an injury, there would have to be a laceration or break in the skin?

"A. There would.

"Q. There is no such thing as septic poison from a bruise?

"A. The germ does not spring up. It must enter the system through some source. Through some wound or abrasion for it to enter."

Plaintiff's husband died on February 14, 1928, and was buried the following day. On February 22, 1928, his body was exhumed in the presence of and was examined by Dr. O. C. Rigby, Dr. C. U. Johnson, and the undertaker, Mr. W. B. Corry.

Dr. Rigby testified that he examined the body, and that:

"The right foot and leg were found to be considerably larger than the left foot and leg. There was evidence of a cellulitis extending from the ankle to the knee on the outer surface of the right leg and right foot. The incision was made from the ankle towards the knee over the fibula of the right leg. Both the tibia and fibula were exposed, as were the bones of the foot. In moving these about, you could hear the bones of the foot grating together, establishing the fact that there was some diseased process in the bones of the right foot. The bones of the foot were found to be diseased and badly necrosed. They were soft, and so badly necrosed that one could take a knife and tear the bony tissues to pieces. The periosteum over these bones, in lots of places was eaten away by the disease. This dis-

eased process extended on up to the ankle and up into the ankle joint on the tibia, the lower end of which showed diseased bone where the periosteum had been eaten away, and there was soft, purulent, honeycomb looking tissue. There was evidence of both periostitis and osteomyelitis of the tibia at its lower end, and the same disease existed as to the fibula. About three inches of the tibia and fibula were sawed off and placed in preservative for laboratory examination if necessary to look at.

"Q. With the history that was given to you, and which you have recited as being given you as the history of this dead man, Robert G. Colquette, and what you found, what have you to say about the conditions which you found in the bones of his leg, as having probably caused his death?

"A. Well, I think it certain that it did cause his death. We know that any bony infection, such as osteomyelitis, will give you general septicemia, and you will have death either from some heart complications or some septic condition, like septic pneumonia, following the osteomyelitis, and when brought on will terminate in death as general septicemia.

"Q. Was there any escape from death for that man, unless that condition was relieved?

"A. No, sir.

\* \* \* \* \* \*

"Q. Now it is contended here, on the part of the defense, that this man died of pneumonia; that this pneumonia was in no manner caused from the condition of that leg. What have you to say about that?

"A. Of course, it would be impossible for me to say that the man did not have pneumonia, but if he did have pneumonia I would naturally believe that it was due to the septic condition, from the affection of the foot and leg.

\* \* \* \* \* \*

"Q. You say it is reasonably possible for this man to have died of some disease in which this diseased condition of the foot played an important part in the cause of his death?

"A. I think it played an important part in his death, it makes no difference what he died from."

Dr. Johnson and the undertaker, W. B. Corry, testified, substantially, to the same findings and opinions as those of Dr. Rigby.

Dr. Thomas Ragan testified that he had listened to the testimony given by Dr. Rigby and had examined the section of bone removed from the ankle of the deceased by Dr. Rigby, and agreed with Dr. Rigby in the opinion that the condition of the foot of the deceased was the cause of his death.

He was asked:

"Q. The testimony is, that Mr. Colquette got hurt on November 27th, 1927, and he lingered along, walking on crutches, his foot still in a badly diseased condition, or in a diseased condition, so much so that he was not able to put it on the ground or walk, had to use a crutch or crutches. The evidence shows that he never did get well, and that on the night of February 13th he went to bed as usual early in the night, at least some time before eleven o'clock or about eleven o'clock, when he was taken with some kind of a rigor and died the next morning about nine-thirty. What have you to say about pneumonia, or influenzal pneumonia having set up and having been the sole cause of his death, in view of the fact that he had a leg like that, under those circumstances?

"A. Well, if pneumonia had been the cause of it, it would be a type of pneumonia, a progress of pneumonia, that I am not familiar with. I have never seen pneumonia develop in that way at all. That would be the last thing I would think of as being the cause of his death.

"Q. How long would it have taken for pneumonia to have set up to have caused his death?

"A. I think that four days is a rather early death from pneumonia.

"Q. Do you think it reasonable for a man to have been walking around with practically no apparent symptoms of pneumonia, of a disease such as pneumonia, for several days before he went to bed, with a diseased foot on him like that?

"A. No; a man doesn't walk around with pneumonia; he is promptly prostrated."

Dr. E. L. Sanderson testified that he had examined the bone cut out of the deceased's foot, that it looked like the lower end of what is known as the tibia, or the large bone of the leg, right where it joins the ankle joint, and that it appeared to have been diseased, devitalized, or broken down, before death.

And he was asked:

"Q. Where a patient dies of sepsis—I believe you say is the proper word to call it?
"A. Yes.
"Q. What other complications usually attend it?
"A. A patient who has chronic sepsis —well, it is not necessary to make that statement. I will say this, that a patient usually, who dies of sepsis, dies with what we may call an acute sepsis, no matter how long he has had chronic sepsis. The thing usually flares up with acute exacerbation that causes death. This acute sepsis is ushered in by a chill, rapid rise in temperature and general severe constitutional symptoms. Usually, if this septic condition is in the leg, there will be a red line running to the groin of the body; if in the hand, it will run to the arm pit; but this acute sepsis, coming on, spreads up likewise to the body rapidly, localizing itself in the most vital organs of the body and causing all forms of heart condition. And, in practically every case where death ensues, pneumonia is present, called septic pneumonia. That is the usual terminus of acute sepsis.
"Q. Well, is that true pneumonia, that kind of pneumonia that you mention?
"A. Well, insofar as the physical signs are concerned, it is like any other pneumonia, and at an autopsy you could hardly tell the difference without the history."

He was then given a history of the injury to the deceased and his condition subsequent thereto, and was asked:

"What, would you say, in all probability caused his death?"

And he answered:

"A. Taking for granted that the recitation of facts is true, I would say that this man had an injury to the bones of his foot and that from some part of his body infection reached his foot and that he was suffering from a process of low grade chronic infection. That on this day that he got worse, the infection became enlivened, and acute sepsis set in. In fact, that may have been and probably was the first instance of generalized infection. Up to that time it was, perhaps—in all probability it was localized in his foot, but at this time it got away from his foot and became general, going up his leg to his groin, where it first strikes the glands, and would naturally produce such symptoms as you have described. Later, passing this point, it went into his body and affected all of his organs—lungs, heart, liver, and produced his death."

Dr. P. K. Rand testified that he had examined the bones cut out of the foot of the deceased, and was asked:

"Q. In what condition did you find those bones, doctor?

And he answered that—

"The specimen represented the lower end of the tibia, and fibula, approximately 3½ inches in length. The upper end had been sawed off transversely, and the lower end disarticulated the ankle. A small part of the soft tissues, that is, the muscles, tendons, ligaments and blood vessels, etc., had been removed from the specimen. The tissues holding the two bones together were still intact. The articular surface which represented the upper portion of the ankle joint, showed the cartilage perfectly smooth. The bones, both the tibia and fibula, had most of the periosteum intact, and the bone itself was hard, firm and smooth. The marrow of the bone was present, although the part next to the ends of the bone had been lost or removed. I did not notice any unusual discoloration—the periosteum was

146

not raised. There were no loose fragments of bone tissue—the consistency of the bone was perfectly normal."

He further testified that he found no evidence that the deceased was suffering from osteomyelitis; that, if he had been suffering with that disease in that particular bone when he died, the covering of the bone or periosteum would have been considerably thickened or separated from the bone itself by pus which was accumulated under the periosteum; that, where that disease exists, the hard, bony substance breaks down and is more or less chalky, brittle, and pliable to the touch, with areas of bone scale on the elongated pieces of bone attached, and that none of these conditions existed in the bones he examined.

And he was given the history of the deceased's condition, beginning with the injury and on down until his death, and was asked if, in his opinion, there was any connection between the condition of the ankle and the death, and he answered:

"I don't see how there would be any connection at all."

W. B. Corry testified that he was an undertaker and had assisted in the burial of the 'deceased, and, in conjunction with Dr. Rigby, had subsequently disinterred the body. Asked what he did, he said:

"We viewed the whole body, but especially the lower extremities. The left leg was apparently normal in size and appearance, except for a scar or two on the left leg. The right leg was twenty-five per cent larger than the left leg, and inflamed from the ankle up to the knee, especially on the outside.

"Q. What indicated that inflammation?

"A. Red streaks running from the foot up towards the knee. We made an incision on the outer side of the leg, just below the ankle, extending toward the right knee, and examined the covering of the bone and the bony tissue itself and removed a section of the lower portion of the right leg and placed it in a glass jar for future examination.

"Q. Did you examine that bone?

"A. Yes, sir; the covering of the bone was thickened and inflamed and in places there was pus under the coverings of the bone; and the coverings were split and the bone examined and found to be necrotic.

\* \* \* \* \* \*

"Q. What have you to say as to the condition you found there, being sufficient cause for that man's death?

"A. There was plenty of trouble in his leg to have caused death from septicemia, commonly called blood poison,"

He was given a history of the case, and asked:

"Do you think it is possible, if that is anything like a correct history of his case, that pneumonia was the cause of his death?"

And he answered:

"The history doesn't sound like it was from pneumonia at all. It sounds more like symptoms of blood poison setting up."

Deceased's daughter, Mrs. Burma Colquette Mason; his widow, the plaintiff; another daughter, Mrs. Zella Simms; her husband, J. E. Simms; W. B. Perkins, a local merchant; Charlie Delcoe, and C. C. Colquette, a son, all testified, in effect, that the deceased had never recovered from the injury to his foot, and that he could not dispense with the use of crutches.

The district judge, who heard and saw the witnesses testify, reached the conclusion that there was a causal connection shown between the injury to the deceased and his death, and we cannot say that he manifestly erred.

Plaintiff asks that the amount of the

weekly payment awarded her be increased from $6.63 to $7.73, that the duration. of the payments extend over not exceeding 300 weeks, dating from November 27, 1927, the first payment to her to be due as of February 14, 1928, and that the compensation for the period between the date of the accident, November 27, 1927, and that of the death of the deceased, February 14, 1928, be credited with the compensation paid by the defendant to the deceased during and for that space of time; and she also asks that the fees of the experts who testified in the case be increased from $15 to $20, and be taxed as a part of the costs of suit.

It was admitted on the trial that the deceased was earning $3.40 a day and working seven days in the week. The weekly payment awarded plaintiff was calculated on the basis of a six-day week. It should have been based upon a seven-day week. So ascertained, it amounts to $7.73.

We see no sufficient reason for increasing the amount of the fees allowed the experts. However, their fees should be taxed as part of the costs of suit.

The statute (Act No. 85 of 1926, section 8, subsec. 2, par. J) provides that:

"Where payments of compensation have been made to the employee before his death, the compensation for dependents as provided for in this section shall begin on the date of the last of such payments and shall not continue for more than three hundred weeks from the date of the accident."

The deceased was injured on November 27, 1927, and died on February 14, 1928, and it was admitted on trial that defendant had paid him compensation during this period, aggregating $172.38, or for 13 weeks at $13.26 a week.

It is therefore ordered, adjudged and decreed that the judgment appealed from be amended so as to increase the amount of the weekly payment awarded plaintiff from $6.63 to $7.73, the payments to begin as of date February 14, 1928, and to continue for not more than 300 weeks from November 27, 1927, each payment to bear legal interest from its maturity until paid; compensation for the space of time between the accident to and death of the deceased to be credited with and deemed satisfied by the payments aggregating $172.38 made by defendant to the deceased.

It is further ordered, adjudged and decreed that in all other respects the judgment appealed from be affirmed.