BRIM v. HOME ACCIDENT INS. CO.

(January 5, 1931. Opinion and Decree.)
(February 2, 1931. Rehearing Refused.)
(March 30, 1931. Writs of Certiorari and
   Review Refused by Supreme Court.)

Norman, McMahon & Breckwoldt, of New
Orleans, attorneys for plaintiff, appellant.

Beard & O'Keefe, and Alvin R. Christo-
vich, of New Orleans, attorneys for de-
fendant, appellee.

WESTERFIELD, J. Plaintiff has ap-
pealed from a judgment dismissing her suit
for compensation for the death of her son,
alleged to have been caused by an accident
occurring in the course of and arising out
of his employment. The suit was brought
directly against the Home Accident Insur-
ance Company, which had underwritten the
liability of the Gratia Distilleries, Inc., with
respect to compensation due its employees,
under the authority of Act No. 85 of 1926.
It is alleged that there is due plaintiff
32½ per cent of $21, the weekly wage of
her deceased son, for a period of 300 weeks,
plus $150 for funeral expenses. The de-
fendant originally denied that Ryan had
suffered an accident in the course of his
employment, but, apparently, has yielded
that contention, as it might well do in view
of the evidence in the record, particularly
that to the effect that compensation was
paid Ryan aggregating $81.90.

The defense now relied upon consists in
a denial that Ryan's death had anything to
do with his injuries. In other words, it is
insisted that he died of natural causes.

It appears from the testimony in the rec-
ord that on October 15, 1928, about 9:30
o'clock p. m., Ryan fell from a ladder to
the floor of the sterilizing room of the dis-
tillery of his employer. He arose and ap-
proached a Mr. Robert White, described
as a United States warehouse agent, sta-
tioned at the Gratia Distillery in another
part of the building. He appeared to be
very much dazed, was bleeding from a
wound above his left eye, and was unable,
at first, to express himself clearly. After
regaining his composure he stated the cause
of his injury and was conveyed to the
Charity Hospital in an ambulance, where
his lacerated wound was sutured, and, since

he refused to remain in the hospital, was instructed to go to the out-patient clinic for further treatment. He did not return to the hospital or the clinic, but was subsequently treated by Drs. Christman and Bradburn on behalf of his employer, who paid him compensation up to November 22, 1928, when he was discharged as cured. Following his discharge by Drs. Christman and Bradburn, he called on Dr. Herman Gessner, complaining of weak and dizzy spells. He was treated by Dr. Gessner until December 31, 1928, when he was discharged by that physician. Ryan does not appear to have consulted any other physician, and, on March 10, 1929, was found dead in his room. An autopsy was performed by the coroner, and that official issued a certificate that the cause of death was "cerebella abscess with necrosis of the left hemisphere. Multiple areas of necrosis on surface of cerebrum; and calloso marginal fissure of each lateral hemisphere. Sub-aracnoid general congestion with œdema of brain. Smear negative for bacteria." Due to the fact that a medicine bottle was found in Ryan's room with Dr. Gessner's name on it, he was notified of the death and was present by invitation at the autopsy. At Dr. Gessner's request a section of the cerebellum was given to him and by him given to Dr. J. A. Lanford, an expert pathologist, who made a microscopical examination of the specimen and reported, as a result of his findings, that the deceased died of tubercular meningitis, or multiple tuberculoma. Ryan appears to have been in good health prior to the accident and to have grown progressively worse after the accident. There is some doubt as to whether he returned to work in the interval between his fall and his death, but we are convinced that, if he did, it was not for more than a day or two, or merely sufficient to demonstrate his inability to continue.

The question before us is whether Ryan's death was due to or contributed to by the accident. As has been seen, nearly five months elapsed between the date of his fall and the day on which he was found dead in his room. It is the present contention of counsel for plaintiff that the fall had the efffect of activating a dormant disease, tuberculosis, and hastening Ryan's death, entitling his dependent to recover under the well-known jurisprudence of this and other states. Behan v. John B. Honor Co., 143 La. 348, 78 So. 589, L. R. A. 1918F, 862; Bradbury's Workmen's Compensation, Third Edition, 326. We say present contention because it was originally claimed that the fall was the direct cause of Ryan's death. However, since this is a suit in compensation, the strict rules of pleading are to be relaxed. Act No. 85 of 1926, p. 122, sec. 18, par. 4. The question presented is most difficult of solution, involving, as it does, the appreciation of medical testimony, upon which we must mainly rely in cases of this character. Landry v. Phoenix Utility Co., 14 La. App. 334, 124 So. 623. We realize that medicine like law is not an exact science and that it is in the heat of controversial disputation that its beneficent truths are forged. We owe much to that noble profession whose remarkable achievements have lengthened our days and lightened our hearts, but, in the nature of things, much remains to be discovered of the mysterious processes of life and of the cause of death and dissolution, and so it is that not one of the eminent physicians, who testified in this case, was able to say, with any confidence, exactly what caused Ryan's death; whether trauma or the tuberculosis, singly, or in conjunction. Dr. Johns, for example, who, with the coroner, Dr. Roeling, testified in plaintiff's behalf, expressed the opinion that the accident was a contributing cause based upon his knowledge of certain uncontroverted medical the-

ories. Dr. Lanford, who, with Dr. Gessner, supported defendant's contention, was of the opinion that the tuberculosis alone caused Ryan's death, giving equally substantial reasons for his conclusion, but neither he nor Dr. Gessner would say that the trauma could not have been a factor in the result. Tuberculoma of the brain, it is agreed by all physicians, is the result of a secondary infection, the primary source of the disease being elsewhere in the body. In other words, tubercular bacilli do not primarily affect the brain, but are carried there from some other focus, or foci of infection by the blood stream. Dr. Johns is of the opinion that the trauma, or the blow on Ryan's head, produced a situation most favorable to a secondary infection, for the reason that the trauma had damaged the tissue and rendered it more susceptible to tubercular infection than normal healthy tissue. In this view he testified he was fortified by the opinion of three of the leading pathologists whose works he had consulted preparatory to his appearance in the case as a witness. The report of the coroner, as well as that of Dr. Lanford, indicated an abscessed condition of the brain. This abscess was located in the back of the skull, whereas the injury which Ryan received was in the frontal portion. Dr. Johns explains that the effect of traumatic injury to the frontal portion of the brain is more likely to produce hemorrhage on the opposite side than in the immediate vicinity of the blow. The post mortem examination disclosed no evidence of hemorrhage, and this fact, it is claimed, precludes the idea of any serious traumatic injury to the skull. Referring to this finding by Dr. Lanford, Dr. Johns explains, and it is not controverted by other medical testimony, that after five months, the period which elapsed between the accident and the death of Ryan, "the encroachment of the abscess would have liquified the blood, transformed it all into exudate, so that it would not be recognizable as blood." The fact that five months elapsed between the time of the fall and the death of Ryan is also said to seriously weaken plaintiff's contention that the accident was a contributing cause of Ryan's death, but here, again, Dr. Johns informs us that "it would be entirely compatible with the usual history of brain abscesses for a man to live that long with tubercular abscess."

Dr. Roeling, the coroner who performed the autopsy and whose original finding to the effect that the cause of death was disassociated with the tubercular infection, conducted only what is called a "gross examination," without the aid of a microscope, and was evidently in error. Dr. Lanford, whose reputation as an eminent pathologist clearly appears from the record, made a most careful examination of the segment of the brain submitted to him and is the only one of the physicians who did. Both Dr. Gessner and Dr. Johns testified upon the reports of Dr. Roeling and Dr. Lanford. However, we do not believe Dr. Johns to have been at a disadvantage in that respect, since he has accepted Dr. Lanford's report at face value and has made his deductions therefrom. It is only in the conclusion which Dr. Lanford reached that he differs from Dr. Johns, and then only to the extent that necrosis, or abscess of the brain, had more the appearance of having been induced by specific organism than by contusion, or trauma. Dr. Lanford, however, was frank enough to say that necrosis due to trauma differed only minutely from a similar condition due solely to bacterial action. Dr. Gessner, when asked whether the tuberculoma was in any respect due to the accident replied:

"I cannot say that it is impossible for it to have produced a tuberculoma, but judg-

ing from the usual long period of tuberculosis processes, I think that his tuberculosis disease preceded his injury."

He also expressed the opinion that the tuberculoma of the brain would have caused his death eventually, independent of the accident. When asked whether, conceding the presence of tubercular infection in the brain, the trauma would activate its destructive process so as to cause earlier death, Dr. Gessner replied that it was possible, and finally, in reply to further questioning on the subject, answered that it was "theoretical, yes, sir; we have to admit that." In this connection the language of Chief Justice O'Niell, in speaking of a similar situation in Behan v. John B. Honor Co., supra, is interesting:

"The proof goes no further, in support of the defense of this suit, than to show that the plaintiff might, and perhaps would, at some time, have become disabled by the disease that was lurking in his system, even if the accident complained of had not happened. And that is not much more of a defense than to say that every man must some day come to the end of his worldly career, accident or no accident."

In the case of Weller v. Turnerized Roofing Co., 14 La. App. 150, 129 So. 443, a similar situation was presented. There, as here, the opinion of the medical experts differed upon the proposition as to whether the trauma had been a contributing cause of death, but all agreed that it might have had much to do with the development of pneumonia, from which the plaintiff in that case died. Upon the authority of well-recognized medical theories to the effect that pneumonia resulted from the increased activity of the pneumococci germs due to a lowered bodily resistance and increased susceptibility to infection, which could be due to violent physical shock, or trauma, we allowed recovery in the Weller

case upon the ground that, though the expert testimony was apparently contradictory, it was in agreement upon the essential particulars when considered with reference to the lay testimony in the record, citing Colquette v. Louisiana Central Lumber Co., 11 La. App. 140, 119 So. 714. The lay evidence to which we referred was to the effect that the injured plaintiff had enjoyed previous good health, which, after the accident, progressively declined, culminating fatally. In Fraze v. McClelland Co., 200 Iowa, 944, 205 N. W. 737, it was held that proof of absence of illness prior to injury and rapid development of tuberculosis thereafter, together with medical testimony to the effect that tuberculosis might be accelerated by traumatic causes, was sufficient to support a finding that tuberculosis was caused by the trauma. In Schlenker v. Garford Motor Truck Co., 183 App. Div. 166, 170 N. Y. S. 439, 441, it was held that medical testimony, to the effect that a trauma "of the kind which the employee received could excite a dormant tubercular condition into activity and accelerate death," in the absence of evidence to the contrary, was sufficient to support a recovery, notwithstanding evidence to the effect that no traumatic condition prevailed at the time of the death of the employee three weeks after the accident.

Our conclusion is that the plaintiff is entitled to recover.

For the reasons assigned the judgment appealed from is reversed, and it is now ordered that there be judgment in favor of Mrs. Bertha Brim, widow of Calvin Ryan, plaintiff, and against Home Accident Insurance Company, defendant, in the sum of $6.83 per week for a period of three hundred weeks beginning October 15, 1928, with interest at the rate of 5 per cent on

each installment from its due date, until paid, and in addition thereto, the sum of $150 for funeral expenses and all costs, the whole subject to a credit of $81.90.

JANVIER, J. (dissenting). I am unable to agree with the conclusion reached by my associates, because I am well convinced that the medical testimony clearly preponderates in favor of defendant's contention that the traumatic injury had no causal connection with the subsequent death of the employee.

It is true that those doctors who are of the opinion that there was no causal connection between the injury and the death frankly admit that it is possible for traumatic injury to cause tuberculoma, but, in view of their statements that they are convinced that such was not the case here, it appears that, in order to hold defendant liable, there must be established the doctrine that the mere possibility that the death of an employee resulted from traumatic injury received in the course of the employment renders the employer liable in compensation; that it is not even necessary to show any reasonable connection between the traumatic injury and the subsequent death, if it appears that, prior to the sustaining of the injury, the employee had always been in apparent good health, and thereafter had grown progressively weaker, until overtaken by death; or, to express it in a different way, no matter how greatly the opinions of the physicians may preponderate to the effect that there is no causal connection between the injury and the death in the particular case under consideration, there is liability if they admit that there is even the slightest possibility that in other similar situations death may result from similar injuries.

No such doctrine has been announced either here or elsewhere, and it is not in accordance with the firmly established jurisprudence to the effect that the plaintiff bears the burden of proving, with reasonable certainty, that the death was the result of the injury. In a compensation case in which the question of the cause of death was under discussion, the Supreme Court of Louisiana said:

"A case must be made out to a legal certainty; this is elementary, and is as true in the case of a suit under the Workmen's Compensation Act, like the present, as in any other. Piske v. Brooklyn Cooperage Co., 143 La. 455, 78 So. 734." Haddad v. Commercial Motor Truck Co., 150 La. 327, 346, 90 So. 666, 673.

In other words, then, the plaintiff should not recover if he can show only a remote, possible causal connection between the injury and the death. He must show, at least, great probability, and this by a preponderance of the evidence.

We have many times said that, in technical medical matters, we should be guided by the opinions of medical experts. As we said in Landry v. Phoenix Utility Co., 14 La. App. 334, 124 So. 623, 624:

"We are not privileged to indulge our impressions in a matter so technical."

We must be governed, if not entirely, at least to a very large extent, by the opinions of the doctors.

Those who hold to the theory that the traumatic injury had no causal connection with the death have the preponderance in their favor, and I feel, therefore, that that theory should be accepted. As we also said in the Landry case:

"If we and our brother below have erred, the responsibility must rest with the medical profession and not the judiciary."

I therefore respectfully dissent.