## WRIGHT v. FULLER CONST. CO., Inc.

### No. 14295.

Court of Appeal of Louisiana. Orleans.

Jan. 16, 1933.

Harry M. Mayo, Jr., and Frank T. Doyle, both of New Orleans, for appellant.

L. Walter Cockfield and Wm. A. Green, both of New Orleans, for appellee.

HIGGINS, J.

The plaintiff brought this action to recover compensation for 400 weeks at $18.20 a week (subject to a credit of $109.20 for compensation previously paid), for permanent disfigurement and permanent total disability said to have resulted from a chain striking him across the forehead, nose, and mouth, while employed in driving piling on March 11, 1931, at 9:15 a. m. He also asks for certain medical expenses incurred and all costs of the proceeding.

Defendant admits the employment, the amount of the wages, and the accident, but avers that the injury was slight and that the plaintiff fully recovered therefrom and was discharged by the doctor on April 27, 1931, and that he was paid $122.20 compensation for six weeks' and five days' disability at $18.-20 per week.

There was judgment in favor of the plaintiff, as prayed for, except for the medical expenses and expert medical fees, which were not allowed. The defendant appealed and the plaintiff has answered the appeal and asked for medical expenses in the sum of $90 and $400 for medical expert fees, to be taxed as costs.

It appears that the plaintiff was employed as a "leadman" in the operation of a pile-driving machine in this city and was standing in a position preparatory for placing a cushion on a piling to be driven, when the chain slipped from the piling, which was being drawn into position on a cable, and struck him a severe blow across the face and forehead, causing the disability for which compensation is claimed. He was taken to the offices of Drs. Geismar and Young, where the flow of the blood from his nose and mouth was stopped with packs and his face bandaged, and, after permitting him to lie down and rest awhile, he was sent home unattended. Upon arriving at home he went to bed, and two days later, or March 13, 1931, he was sent to Dr. Joseph C. Menendez. Dr. Menendez removed the bandages and diagnosed the case as a contusion and severe brush burn on the right side of the tip of the nose, and displacement of the whole nose to the right. He also found that plaintiff had suffered a severe blow to his mouth, which caused a loss of three teeth and later sent him to a dentist for treatment therefor. Plaintiff made regular visits to the office of Dr. Menendez and, upon complaint by him of headaches, dizziness, et cetera, an X-ray was taken by Dr. Bowie, to whom he had been referred by Dr. Menendez, on March 24, 1931, and again on January 2, 1932. In the meantime the plaintiff continued to complain of dizziness, severe headaches, and terrible nightmares, with the result that Dr. Menendez also referred plaintiff to Dr. Frederick L. Fenno, a specialist in diseases of the nervous system,

who observed him from March 31 to April 29, 1931, and later on December 30 and 31, 1931. Upon the continued complaint of the plaintiff about headaches, dizziness, and nightmares, Dr. Menendez also sent him to Dr. Val H. Fuchs, ear, nose, and throat specialist, for the purpose of an examination, on April 1, 1931. An examination was made, but Dr. Fuchs did not treat him. Dr. Menendez discharged the plaintiff as cured on April 27, 1931.

On May 2, 1931, plaintiff went to the Charity Hospital, where X-ray pictures were taken, upon which Dr. E. W. Brown made the following report:

"Views of the head and face show a fracture of the nasal bone with considerable displacement but apparent bony union. An opaque foreign body is seen in the inner portion of the left orbit."

The clinical diagnosis by Dr. Anderson made on May 2, 1931, at the Charity Hospital shows a fractured nose and fractured outer table of frontal sinuses. The physical examination by Dr. Lyons showed the following:

"The frontal bone over bridge of nose is depressed, nose is contorted, showing fracture of nasal bones; no tenderness anywhere. Badly deviated nasal septum."

He was treated at Charity Hospital from May 2 through May 16, 1931, both inclusive, and again on November 10, 1931.

Plaintiff also placed himself under the care of Dr. Anderson, as a private patient, and was treated by him for a considerable period of time.

Dr. Charles S. Holbrook, a neurologist and phychiatrist, examined plaintiff on December 21, 1931, and he ordered X-ray pictures to be taken of the plaintiff's head by Dr. Walter Ford Henderson, which were made on December 24, 1931.

The plaintiff contends that as a result of the blow his nose was fractured, causing a deviation of the septum; that three teeth in his left upper jaw were knocked out; that he sustained a fracture of the skull and serious brain injury. Defendant admits that the three teeth were broken off or knocked out by the chain, but argues that the fracture of the nose and deviation of the septum were the result of an old injury and that the depression in the forehead above the nose about the size of a silver dollar, and described as being of saucer shape, was either the result of previous injury, or of congenital origin, and that the accident did not cause any injury to the plaintiff's brain or his present disability, if he is suffering from any.

Plaintiff introduced the testimony of his wife and his daughter, as well as his own, to the effect that on the day he was injured there was considerable bleeding from the nose, mouth, and ears; that his face, previous to the time of the injury, was normal, but thereafter disfigured as above described. He also introduced the testimony of a number of acquaintances, friends, neighbors, and two barbers, who all testified that previous to the accident of March 11, 1931, plaintiff's nose was straight and that the present depression in his forehead was not there. The only evidence offered by the defendant to offset this testimony is that of Drs. Young, Menendez, and Fuchs. Dr. Young, who treated the plaintiff on the day he was injured, said that the plaintiff, in reply to a question by the doctor, answered that he had sustained a broken nose some time before the accident. The doctor did not describe the condition of plaintiff's nose and face before the day he examined plaintiff and treated him. Plaintiff denied making this statement. Dr. Menendez testified that when he examined the plaintiff two days after the accident he found no evidence of a recent fracture of the nose because there was no discoloration and swelling around the eyes, which are incidental to such an injury. He also said that plaintiff had admitted to him that he had sustained a broken nose previously, but again the plaintiff denied making any such admission.

Dr. Fuchs, who examined the plaintiff nineteen days after he was hurt, stated that he found no edema of the mucous membrane in the nasal passages, or any other evidence, such as an abrasion or inflammation of the mucous membrane, which is usually found in cases where the bone of the nose is fractured, but on cross-examination admitted that it was possible in nineteen days for the evidence of an injured mucous membrane and swelling in the nasal passage to abate, or clear, dependent upon the severity of the fracture.

The Charity Hospital X-ray report shows that there was a fracture of the nasal bone "with considerable displacement, but apparent bony union." The medical testimony is to the effect that an old injury of that type would not show on the radiographs.

■■ We believe the plaintiff has clearly shown, by a preponderance of evidence, that the fracture of the nose and deviation of the septum were the result of the accident of March 11, 1931.

Were the depression in the forehead, the alleged fracture of the skull, and the alleged brain injury the result of the blow received by the plaintiff? Again we point out that all of the lay testimony is to the effect that the depression in the forehead was not there until after the accident. One acquaintance stated that after the accident the plaintiff's face was in a terrible condition, there being two black eyes, an injured or disfigured nose, a lot of swelling, and the depression in the forehead, which made it appear as if he had been struck by a hammer. These witnesses also stated that plaintiff was a strong,

healthy, and robust man before the accident, but thereafter was constantly complaining of severe headaches and dizziness, and was always ailing. He appeared to be weak and unwell.

Dr. Holbrook, expert witness for the plaintiff, was of the opinion, from his examination and consultation with Dr. Henderson, who made the X-ray pictures, that the plaintiff had sustained a fracture of the inner table of the skull. He explained that the skull was composed of an outer table or wall, an inner table or wall, and between these two a bony, spongy substance called "diploe"; that as a result of the injury a blood clot formed between the covering of the brain called "meninges" and the inner table of the left side of the head, causing pressure upon the bone, resulting in the absorption of the calcium salt of the bone, thus thereby producing rarefaction of the bone. He was also of the opinion that the plaintiff had sustained a severe brain injury, which permanently and totally disabled him from doing work of any reasonable character.

Dr. Henderson, an expert witness for the plaintiff, testified that the X-ray pictures that he made of the plaintiff's head showed a fracture of the inner table or wall of the skull, a shadowy area which he interpreted as rarefaction of the bone caused by a blood clot, which produced pressure on the bone, resulting in the absorption of calcium salt from the bone and a thinning, or rarefying, of the bone in that area.

Dr. Anderson, called by the plaintiff, stated that from his examination and treatment of the patient he was of the opinion that the plaintiff had sustained a very severe brain injury, which produced dizziness, headaches, and the nightmares, and that the condition was such as to permanently and totally disable plaintiff from doing work such as he had been doing. He and Dr. Holbrook were further of the opinion that, even if the plaintiff did not sustain a fracture of the skull, a severe trauma of the head such as he suffered would be sufficient to cause a very serious brain injury which would produce the symptoms of which the plaintiff complained.

Dr. Menendez, defendant expert witness, testified that after examining the plaintiff and treating him from March 13 through April 27, 1931, he was of the opinion that the fracture of the nose was an old one and that the depression in the forehead was of congenital origin, or the result of a previous injury, because a blow sufficient to cause both of those injuries would have produced such swelling and black and blue condition of the tissues, as well as hemorrhage, that it would have been very noticeable. He found no evidence of these conditions. He stated that there was no pressure on or injury of the brain, because a spinal puncture was made and the fluid examined, which showed it was normal. He

still believed that when he discharged the plaintiff, on April 27, 1931, plaintiff had fully recovered and that his present disability, if any exists, could not be attributed in any way to the slight accident which occurred on March 11, 1931.

Dr. Bowie, an expert witness for defendant, testified that the X-ray pictures that he had made of the plaintiff's head did not show anything with reference to the depression in the forehead. He differed in his interpretation of the radiographs with Dr. Henderson, being of the opinion that they did not show a fracture of the inner table of the skull. He found a peculiar shadow on the right side of the skull in the temporal parietal region, probably due to some rarefaction of the bone; but he explained that the X-ray would not show a blood clot until such time as the blood clot, through pressure on the bone, would cause an absorption of the calcium salt, which would cause rarefaction or atrophy of the bone. With reference to the depression in the forehead the doctor's diagnosis was that it was of congenital origin, or the result of a previous injury, which had entirely healed, because an injury which would have been sufficient to have caused such a depression would have left some change in the bony structure that would have appeared in the radiograph.

It is unnecessary to discuss Dr. Fuchs' evidence with reference to the fracture of the skull or the brain injury because his testimony was limited to a consideration of the fracture of the nose.

Dr. Fenno, an expert witness for defendant, stated that the difficulty with reference to the plaintiff's condition lay between three points, organic lesion, functional lesion, and malingering. He was unable to find any organic lesion. He stated, "I couldn't at any time find any evidence of malingering," and, therefore, was of the opinion that the plaintiff had a functional lesion. He diagnosed the plaintiff's case, after considerable observation and treatment and also consultation with the doctor who made the X-rays and the ear, nose, and throat specialist, as a "post-traumatic anxiety neurosis," which condition was the result of an accidental injury.

In reviewing and studying the record we note that the medical experts for the defendant do not take issue with Drs. Holbrook, Henderson, and Anderson in their statements to the effect that a serious brain injury may result from a blow to the head, without necessarily fracturing the skull, and that where, as a result of an injury, a blood clot forms between the meninges, the membrane covering the brain, and the inner table or wall of the skull, a spinal puncture and examination of the fluid will not reveal any blood, because the meninges localizes the hemorrhage and prevents the blood from getting into the

tissues of the brain and into the fluid of the spinal column.

There was also a considerable number of witnesses on both sides, who testified on the issue of whether or not the plaintiff had been employed to do laborious work from July, 1931, through February or March, 1932; but this evidence is hopelessly irreconcilable. The defendant's witnesses asserted that he was so employed and the witnesses for plaintiff stated, in rebuttal, that he was not. We believe it sufficient to say that the trial judge, who heard and saw the witnesses, believed those appearing for the plaintiff, and we see no reason to differ with his finding in that respect.

We find that the plaintiff has proven by a preponderance of the evidence that the accident which he sustained has caused permanent disfigurement of his face and a total permanent disability to do work of any reasonable character, and that the judgment of the trial court, in awarding compensation therefor, is correct. Yelverton v. Louisiana Central Lbr. Co. et al., 19 La. App. 21, 138 So. 684; Bailey v. Gifford Sand & Gravel Co., 7 La. App. 513; Franklin v. Ernest Rogers Co., Ltd., 2 La. App. 764; McQueen v. Union Indemnity Co., 18 La. App. 612, 136 So. 761; Price v. Gilliland Oil Co., 3 La. App. 175; Connell v. Gilliland Oil Co., 2 La. App. 435.

We note, however, that our learned brother below allowed a credit for compensation paid of $109.20, whereas the correct amount is $122.20, and, therefore, the judgment will be amended in that respect.

■ It further appears from the record that the plaintiff proved that he incurred medical expenses amounting to $90, which we allow. Therefore the judgment will also be amended accordingly.

■ The controversy about taxing as costs the medical expert fees presents three questions:

First, when is the proper time to tax as costs such fees in a compensation case—while the case is being tried on its merits, or after final judgment?

Second, were the doctors who testified qualified as experts and testified as such?

Third, is the compensation or fee which they claim for their services reasonable or excessive?

We shall dispose of these issues in the above order.

Paragraph 4 of section 18 of Act No. 85 of 1926, amending Act No. 20 of 1914, reads in part as follows:

"The judge shall decide the merits of the controversy as equitably, summarily and simply as may be. Costs may be awarded by the said Judge in his discretion, and when so awarded by the said Judge in his discretion, and when so awarded the same costs may be allowed, taxed and collected as are allowed, taxed and collected for like services in other civil proceedings. *The fees of medical witnesses shall be reasonable and are not to be allowed unless fixed in the judgment.* The judgment rendered by the Court shall have the same force and effect and may be satisfied as other judgment of the same Court." (Italics ours.)

The plaintiff's motion to tax as costs the medical experts' fees in the judgment was, therefore, not premature, but proper and timely.

■■ The record shows that Drs. Holbrook and Henderson were unquestionably expert witnesses and gave testimony solely and only as such. Dr. Anderson, in addition to giving such facts as he knew about the case from previous examinations of the plaintiff, also gave lengthy expert medical testimony. While it is true that the judge of the trial court did not appoint these doctors, they having been summoned by the plaintiff as witnesses, this circumstance does not affect their status as experts. Suthon v. Laws et al., 132 La. 207, 61 So. 204; Levy v. McWilliams, et al., 13 La. App. 444, 127 So. 761, 129 So. 170; Act No. 19 of 1884.

■ On the trial of the case on its merits the plaintiff's attorney asked each of the above-named doctors what he considered was a reasonable fee for appearing in court in such a case as the instant one, and each stated that $100 was the usual charge. The defendant did not offer any evidence to rebut this testimony.

In the case of Stokes v. Sondheimer Co., 8 La. App. 745, where the claim was for 400 weeks' compensation for total permanent disability, the trial judge fixed the expert fees of the two doctors at $50 each. The court held that the amount was excessive and reduced it to the sum of $25 each, citing the above-quoted provision of the compensation law.

In Le Seur v. Rumbaugh et al., 6 La. App. 587, where the claim was for 400 weeks' compensation for total disability, the court held that it was not prepared to say that $25, taxed as costs as a medical expert's fee, was excessive.

In Colquette v. Louisiana Central Lumber Co., 11 La. App. 140, 119 So. 714, the plaintiff claimed 300 weeks' compensation and the trial judge taxed as costs $15 each for five medical experts. The plaintiff answered the appeal and asked that the amount be increased to $20 each. The court held that it did not see any sufficient reason for increasing the amount of the fees allowed.

In the case of Chatman v. Compania De Navegacao Lloyd Brasileiro, 19 La. App. 616, 140 So. 141, the plaintiff was allowed compensation for five weeks at $20 a week and $42.65 for medical expenses; but the trial

judge refused to tax as costs the fee of the doctor who appeared and testified for the plaintiff. This court amended the judgment and taxed as costs the medical expert fee in the sum of $25.

The testimony given by the doctors in the instant case was rather lengthy, but we do not believe that they were required to remain in court all day. We fully appreciate the value of the time and skill of the physicians who testified; but, following the legislative mandate that "the fees of medical witness shall be reasonable," we believe that the sum of $25 each would be in keeping with the jurisprudence of the state. However, Dr. Anderson testified twice and, therefore, we will allow $50 to be taxed for his fee.

For the reasons assigned it is ordered, adjudged, and decreed that the judgment of the district court be amended by allowing the plaintiff the sum of $90 for medical expenses, and also $100 for medical expert fees, which are hereby taxed as costs.

The judgment is further amended by allowing a credit of $122.20 for compensation previously paid, instead of $109.20.

In all other respects the judgment is affirmed, the defendant to pay the costs of both courts.

Amended and affirmed.