McBRIDE, Judge.
This is a workmen’s compensation suit in which the defendant, City of New Orleans, has appealed from a judgment rendered in favor of plaintiff, the widow and sole dependent of a deceased workman, awarding her compensation at the rate of $35 per week for the death of her husband, plus medical expenses in the sum of $554.60, and also $600 (the maximum) . as the cost of decedent’s funeral.
Arthur J. Hoffman, a 60-year-old white man, had been in the employ of the City for the five years preceding his death in the capacity of roofer, and counsel are in agreement that Hoffman’s occupation came within the purview of the Workmen’s Compensation Statute. On June 23, 1958, during the scope and course thereof, Hoffman fell striking the back part of his head against a concrete step, and according to the eyewitnesses the blow was severe, one remarking that it made a “sound, a ring or something.” Hoffman died August 12,1958. However, the record discloses that after the accident, he continued on with his occupational duties until July 11, 1958, before consulting a physician. Hoffman never mentioned his injury to the members of his family and it was only after he was under *14 going medical attention that they learned of the accident.
It is not seriously disputed that such an accident as is described above befell the decedent. In passing all we need say on this point is that the testimony of several of decedent’s co-workers makes it certain that the accident did occur.
The appeal presents for decision two issues: (1) Was decedent’s death attributable to the accident, and (2) if so, what is the rate of compensation to be allowed decedent’s widow?
Prior to June 23, 1958, the decedent was a normal, healthy person who worked regularly and he had no apparent physical shortcomings, except the ususal minor illnesses to which each one of us is heir. After his fall, although he continued working, the decedent began to show symptoms of a change in his condition. In the early phases he experienced difficulty in speaking, such as slurring words, difficulty with balancing, and an unsteady gait. Later he began to have irregular and uncoordinate movements of the arms and legs which he could not control and also the loss of grip. These symptoms became progressively worse.
About July 15, 1958, Hoffman’s condition became so pronounced and apparent to his wife that she, without any knowledge that the decedent had sustained the accident, finally prevailed upon him to go to Dr. C. J. Dicharry, a specialist in internal medicine, for examination. Dr. Dicharry, upon decedent’s first visit to him, thought he should be placed in a hospital. However, after Mr. and Mrs. Hoffman informed him they could not afford to pay for hospital treatment, Dr. Dicharry agreed to treat decedent as an outpatient, which he did, until July 26, 1958, when he deemed hospitalization imperative and decedent was then taken to Baptist Hospital where he remained until his death about four weeks later. The reason why Dr. Dicharry sent decedent to the hospital is worthy of note. On the previous day when one of decedent’s fellow workers brought decedent’s paycheck to his home, the worker told Mrs. Hoffman of the accident, and she in turn informed her son thereof, with the result that the son promptly communicated the first knowledge of the accident to Dr. Dicharry, who then immediately ordered decedent’s hospitalization.
Defendant’s learned counsel point up the fact that decedent died in the hospital of bronchopneumonia, and they advance the argument this condition had no causal connection with decedent’s accident. It is true that said malady was the terminal cause of the death, but it is clear from the testimony that the decedent was not afflicted with pneumonia when Dr. Dicharry had him placed in the hospital. From his initial examination made of decedent, which was before he had knowledge of the fall, Dr. Dicharry was of the opinion that decedent had an organic brain condition which diagnosis seems to have been confirmed by the news of the accident, hence the order for immediate hospitalization. During the course of treatment Dr. Dicharry found it necessary to call in for purposes of consultation Dr. Corales, a neurosurgeon, and Dr. Paddison, a neurologist, and while neither of these doctors testified, Dr. Dicharry stated from the witness stand that Dr. Pad-dison’s diagnosis was that decedent’s condition resulted from a clot formation in a vessel in the brain which obstructed the flow of blood. Dr. Dicharry stated that Dr. Corales held no opinion as to what was the cause of decedent’s condition.
Dr. Dicharry freely and frankly admitted he was in doubt as to what was the cause of death, and whereas there was a history of trauma, he reported the death to the coroner’s office and an autopsy was performed by Dr. Monroe Samuels in the presence of Dr. Rafael Sanchez, the brain being removed from decedent’s skull and sectioned. The coroner’s autopsy protocol recites that death was caused by “bronchopneumonia; pulmonary congestion and edema; marked cerebral edema.” Neither Dr. Samuels nor Dr. Sanchez could say what brought about *15 these conditions. One of the pathological findings, however, was that decedent had an eggshell (very thin) skull. Dr. Samuels testified a blow to the head could produce edema of the brain.
Dr. Dicharry explained that “cerebral edema” means a swelling or condition of the brain caused by excessive fluid, but that the phrase itself gives no inkling as to what might be the basic cause of the condition. Because the diagnosis entertained by Dr. Paddison that the patient’s condition resulted from a blood clot was not demonstrated by the autopsy and there was no apparent cause for the edema, Dr. Dicharry said he “must assume” that the fall “might have” something to do or “had” something to do with the brain damage. He made it clear “there was certainly no other cause presented.” At another point in his testimony he stated “ * * * there is some relationship between this man’s injury and his eventual death. Certainly no one has given me any information to show me why this man died.” When asked would he know whether death was attributable to the fall, Dr. Dicharry stated: “From the relationship of events and the report of the coroner I feel that it was.”
At still another point in his testimony Dr. Dicharry was asked if it was his view “that the blow to the head probably caused the condition of the brain,” and his answer was:
“Yes. In the discussions in this case I was satisfied to go along with the diagnosis of the neurologist, who is a fine neurologist, but then, at post, when they cut the brain into little pieces and still could not give us an answer as to what happened to this man, I have to assume that there could be some relationship between the injury and his death.”
The fact that decedent made no mention of being injured until some weeks after the accident came in for discussion, and Dr. Dicharry said he attached no importance to that circumstance as it is not at all unusual for persons to have no immediate severe complaints after such injury, and that this might well account for decedent’s not having informed his family or Dr. Dicharry about the accident.
Dr. Dicharry, we think, very lucidly explained why the decedent developed the bronchial pneumonia which was the terminal cause of his death. Some of his testimony on this feature of the case runs as follows :
“Q. You think he probably got the bronchopneumonia in the hospital? A. Yes.
* • * * * * *
“Q. Now, the coroner’s autopsy protocol also refers to a condition known as bronchial pneumonia and one known as pulmonary congestion and edema — as causes of death. Would you explain, in Mr. Hoffman’s case, how these things are related to his condition there? A. Well, because of his condition caused by his central nervous system disease he had to be heavily sedated, because of his convulsions he could not be fed properly, and eventually any individual under these circumstances will develop bronchial pneumonia if they live long enough, and pulmonary edema and pulmonary congestion if you live long enough.
“Q. In other words, these are terminal diseases so-called? A. Yes, sir.
“Q. And these diseases are brought about by his hospitalization and the treatment that is necessary? A. That’s right.
“Q. Would you say the primary cause of the death, however, would not be the bronchial pneumonia in this case, or the pulmonary congestion? A. Those are terminal events. They—
“Q. Caused by? A. Caused by whatever he had originally.”
No one, after reading the medical testimony contained in the record, could leave it *16 without the firm conviction that Hoffman’s death resulted from the accident and the injuries received therein.
Counsel for the defendant argue that the plaintiff has not proved her case with legal certainty and contend that the testimony of Dr. Dicharry does not definitely establish there was causal connection between the accident and decedent’s death. We cannot agree with this theory at all. It is true Dr. Dicharry never positively stated that an injury caused the death, hut he did make it clear there was some relationship between the two and that he had to assume the accident had something to do with the death, and in view of the sequence of events and the report of the coroner he would “feel there was a connection.” A consideration of the testimony from a reasonable viewpoint satisfies us that decedent’s ultimate death was brought about as a result of the blow to his eggshell cranium.
This calls to mind what our brothers of the First Circuit said in Sharp v. Esso Standard Oil Co., La.App., 72 So.2d 601, 609:
“A court, in applying medical evidence to facts in a case of this kind, has to apply common sense and everyday experience to correctly resolve a situation. We know medical science knows more about these things than we do, and our experience has been, from hearing testimony of this kind, that when a doctor says ‘possible’ or ‘probable’, he does not mean that it did not happen as contended in the sense that an ordinary layman would understand his words. In giving their testimony, all medical experts try to give guarded testimony, and some courts try to draw a distinction between possibilities and probabilities. To our way of thinking and to the modern trend of the courts in considering these terms, we should look at them in a common-sense way.
“ ‘The distinction between probability and possibility should not follow too slavishly the witnesses’ choice of words, as sometimes happens in respect to medical testimony. A doctor’s use of such words as “might”, “could”, “likely”, “possible” and “may have”, coupled with other credible evidence of a non-medical character, such as a sequence of symptoms or events corroborating the opinion, is sufficient to sustain an award. It is a common experience of compensation and personal injury lawyers to find that the more distinguished a medical witness is, the more tentative and qualified are his statements on the witness stand. He will testify that the sledge-hammer blow on claimant’s head might have caused claimant’s headache, but hesitates to say positively that- this was the only possible cause, and may concede on cross-examination that there could conceivably be other causes. The weight of such testimony, however, should not be too sharply discounted because of the disposition of the highly-trained scientific mind to refrain from unqualified statements or opinions on such matters as causation.’ Larson’s Workmen’s Compensation Law, Vol. 2 § 80.32, page 322.”
The decedent was employed by and worked for the City of New Orleans on a semi-weeldy basis, and at the end of each two-week working period was paid the sum of $129.69, or at the rate of $64.85 per week. It is conceded by plaintiff’s counsel that the trial judge was in error in allowing the maximum compensation of $35 per week.
LSA-R.S. 23:1232 provides in part:
“Payment to dependents shall be computed and divided among them on the following basis:
“(1) If the widow or widower alone, thirty-two and one-half per centum of wages.”
*17 The conditions of decedent’s employment required that he work five days per week, that is, from Monday through Friday, and the record does not show that decedent or any other employees of the City of New Orleans ever worked or could have worked on Saturday. Counsel for plaintiff contend that although decedent’s wage of $64.85 was for a 5-day week, whatever compensation his widow is entitled to should he based on a 6-day work week, and argue that as the daily wage amounted to $12.97, such sum should be multiplied by six which would make the weekly wage $77.82.
In support of their contention that a 6-day week is the basis, counsel have cited us to several cases decided by the Supreme Court, all of which we have examined. However, a detailed discussion of all these cases is unnecessary; suffice it to say that we are convinced the Supreme Court has never held that where the contract of employment contemplated a 5-day week and restricted the workman thereto that the workman, if injured, is entitled to compensation computed on a 6-day week.
The latest case to which counsel point is Farley v. Ryan Stevedoring Co., Inc., La., 117 So.2d 587, 594, wherein the Court was concerned with a compensation claim arising from the death of a longshoreman who worked intermittently for the defendant on an hourly wage rate. In establishing a base for fixing compensation, the court multiplied the hourly wage by 8 in order to arrive at the daily wage and then multiplied that by 6 to establish what would have been his earnings had the employee worked a full week. The Court said:
“ * * * Since longshoremen have no set time to work and are employed when their services are required, we conclude that an employee of this trade could work a six day week. Jarrell v. Travelers Ins. Co., 218 La. 531, 50 So.2d 22; Carrington v. Consolidated Underwriters, 230 La. 939, 89 So.2d 399; Colquette v. La. Central Lumber Co., 11 La.App. 140, 119 So. 714. Therefore, Mr. Farley’s weekly wage was $120.00 (six times his daily wage of $20.00).’’
In Carrington v. Consolidated Underwriters, 230 La. 939, 89 So.2d 399, 403, another of the cited cases, the injured workman who was employed in a sawmill was allowed compensation based on a 6-day work week. The evidence in the case showed that there was no contract of employment or regulation restricting plaintiff to a 5-day work week. The employer undertook the actual sawing of logs during only 5 days of each week; however, on the sixth day the company engaged in certain other operations such as cleaning up, stacking and loading lumber, and running a planer; and in these the plaintiff sometimes assisted although he was not required to do so. Under these circumstances, the Uourt said:
“Our conclusion is, therefore, that plaintiff’s compensation should have been computed on a six day, rather than on a five day, work week.”
In a per curiam on applications for rehearing in the Carrington case, the Court remarked that under LSA-R.S. 23:1021 (11) “ ‘Wages’ means the daily rate of pay at which the service rendered by the injured employee is recompensed under the contract of hiring in force at the time of the injury,” and that said section has been a source of repeated confusion. The Court reviewed many cases involving the controverted issue of what was the weekly wage, and stated that after determining an employee’s daily wage, the six-day week is to be employed in calculating his weekly wage, for if he is injured he is deprived of his ability to work six days per week, and remuneration is to be awarded him for such deprivation. In all of the authorities reviewed in per curiam the workman could have or might have been able to work at his occupation for the six days. However, we repeat that in none of the authorities cited in the per curiam was the injured workman specifically employed on a five-day work *18 week basis nor was his right to work more than five days restricted by the employment contract.
In the course of its opinion the Carring-ton case the court mentioned Barr v. United Gas Public Service Co., 183 La. 873, 165 So. 129, in which compensation was computed on the basis of a 40-hour work week (4 days of 10 hours each), the maximum time the employee was permitted to work under the Gas Code of the American Gas Association, and pointed out that the controversy before it was different from the Barr case in that there was no contract of employment or regulation restricting the compensation claimant to a 5-day work week. We think this indicates beyond any question of doubt that when the contract of hiring or any regulation, as in the Barr case, restricts the workman to a 5-day work week that the weekly wage earned for the 5-day week should stand as the basis for the compensation award.
In Cage v. Fidelity & Casualty Co. of New York, 117 So.2d 923, 927, this court computed an injured workman’s compensation on the amount earned during a work week consisting of 5 days of 8 hours each which the testimony showed to be “the normal work week.”
We think that Barr v. United Gas Public Service Co., Inc., supra, and Carrington v. Consolidated Underwriters, supra, are complete authority for fixing the compensation due the plaintiff in the instant case in accordance with the conditions of the employment which restricted decedent to a 5-day week and, therefore, she would be entitled to 3214'% of the weekly wage of $64.85, or $21.08.
Counsel for the City of New Orleans in their brief seem to entertain some apprehension regarding the implication of that portion of the judgment which fixed the fee of plaintiff’s attorney which reads as follows:
“It is Further Ordered, Adjudged and Decreed that the attorney’s fee payable to Thomas J. Meunier as attorney for plaintiff is recognized and fixed by the Court at the maximum amount allowed by law, to-wit, twenty (20%) percent of the amount of this award on the first $5,000.00 thereof I and (10%) percent on the amount of this award in excess of $5,000.00.”
It is clear that the trial judge had no intention to and he did not cast the City of New Orleans for the fee of plaintiff’s attorney, but merely approved the percentage of the recovery plaintiff’s attorney was entitled to receive for representing her.
Therefore, for the above reasons the judgment appealed from is amended so as to reduce the rate of compensation from $35 per week to $21.08 per week, and as thus amended and in all other respects the judgment is affirmed.
Amended and affirmed.
REGAN, J., absent, takes no part.