No. 4157

Second Circuit

YELVERTON v. LOUISIANA CENT. LBR. CO. ET AL.

(January 14, 1932. Opinion and Decree.)
(February 16, 1932. Rehearing Refused.)

Cas Moss, of Winnfield, attorney for plaintiff, appellant.

Thornton, Gist & Richey, of Alexandria, attorneys for defendants, appellees.

DREW, J. Plaintiff sued under the Workmen's Compensation Act of Louisiana (Act No. 20 of 1914, as amended), alleging that Luther Johnson was employed by the Louisiana Central Lumber Company to manufacture and deliver cross-ties to its tram railroad, and that, while he was working for the said Johnson on August 15, 1930, hauling ties, a cross-tie fell from the wagon, the end of the tie striking his foot, crushing and fracturing the bones, and tearing the ligaments to such an extent as to render the foot permanently disabled, and that he has lost the use of the foot. He prays for compensation at the rate of 65 per cent of his weekly wage for a period of four hundred weeks.

Defendant admitted that Johnson was engaged as an independent contractor with defendant in manufacturing and delivering

cross-ties to its railroad on August 15, 1930, and that plaintiff was employed by Johnson; that, while engaged in the regular scope of his employment, a cross-tie fell on plaintiff's foot, causing certain minor injuries and contusions which disabled plaintiff from performing his usual work for a few weeks. The wages claimed by plaintiff are admitted, and defendant alleged that it had paid plaintiff compensation for a period of fifteen and one-sixth weeks, and furnished proper medical attention; that it ceased to pay plaintiff compensation on December 1, 1930, at which time he had fully recovered.

The lower court rejected plaintiff's demands as of non-suit, and he prosecutes this appeal. Defendant has answered the appeal, praying that the demands of plaintiff be rejected.

Counsel for plaintiff has abandoned his claim for four hundred weeks' compensation in this court, and correctly states that, if plaintiff is entitled to compensation, it is for the total loss of the foot, and could not exceed 65 per cent of his weekly wage, for a period of not more than one hundred twenty-five weeks.

A cross-tie fell on plaintiff's foot, injuring it to some extent. He remained in his home for one day, and, according to his testimony, he used crutches for about one month and ten days. He visited a doctor on the third day after the accident, and continued to visit him weekly thereafter until he was discharged, about December 1, 1930—three and one-half months after the accident. Plaintiff's foot was swollen for five or six weeks after the accident, when all the swelling left the foot. A month and a half after the accident he went squirrel hunting with some friends

and remained in the woods for six or seven hours. Although plaintiff was limping at the time, he did not complain to his companions of his foot hurting him. In the latter part of October or first of November, plaintiff stated to Dr. Mecom that his foot was well, and that he was ready to go back to work. Dr. Mecom testified that at the time plaintiff was walking in a regular manner. About November 1st plaintiff applied to his former boss for his job, and was informed that his services were not needed, due to a cutting down of the crew. He also applied to two others for a job, but was not successful in securing one. Afterwards plaintiff went back to Dr. Mecom, complaining of his foot, and Dr. Mecom ordered him paid compensation until about December 1, 1930, when he ordered the compensation to cease, and pronounced plaintiff well. This suit followed.

Plaintiff offered a number of relatives and friends as witnesses, all of whom testified that prior to the accident plaintiff walked without a limp and as any other ordinary man would, but that since the accident he had constantly limped and walked on the side of his foot. Mr. Holly, an uncle of plaintiff, testified that in the month of November, December, or January following the accident, he sawed wood with plaintiff for two days, and that plaintiff had to quit work on account of his foot.

Mr. Warwick testified that he worked with plaintiff, carrying cross-ties to be cut into wood, and that plaintiff was bothered with his foot. He does not fix the time.

Dr. Mecom, who had charge of plaintiff for the defendant company, contends that plaintiff is a malingerer. If this is true, the lay testimony offered by plaintiff is of little more value than his own testimony,

as it is all based upon the assertions of plaintiff and his actions in limping, caused from walking on the side of his foot. If he is a malingerer, it would be very easy for him to fool his friends who occasionally saw him, as well as his more intimate relations and acquaintances.

As to the real injury to plaintiff's foot, it is necessary for us to look to the testimony of the physicians who testified in the case. Dr. Mosely examined plaintiff the day before the trial and made an X-ray of the foot. He testified that the X-ray showed the head of the fifth bone of the foot to be rarified and a little nick off the end of the fourth bone of the foot; a little inflammation of the joint between the fourth and fifth toes, and that he has traumatic arthritis of the toes, caused by blood, nerve, or foot sprain. He further testified that the accident could have caused injury to the ligaments and tendons of the foot, but there was no way to tell, and he does not know whether the injury is permanent or not.

All of the doctors testified that plaintiff is suffering in both feet with what is known as "flat feet." Dr. Green made an examination of plaintiff's foot in December, 1930. He did not make an X-ray of it. He testified that from looking at the foot he could not tell there was anything wrong, except that plaintiff had flat feet. However, he concluded that he had traumatic arthritis in the foot and toes.

Defendant offered four doctors, and Dr. Mecom, who examined plaintiff shortly after the accident and every week thereafter until he was discharged. When Dr. Mecom first examined him, he found some contusion of the instep of the foot, with swelling; and that the swelling disap-

peared in a few weeks. He testified that the X-rays, including one made by Dr. Mosely, disclosed no fractures and no abnormality. When plaintiff was discharged, he was walking on the bottom of his foot. He saw him walk about town and as he came to his office. He said the arch was not broken down, and that the ligaments could not be injured without injuring the bones of the foot; and that there was no tenderness of plaintiff's foot, and arthritis would necessarily cause tenderness.

Dr. Rand saw plaintiff and examined him on October 28, 1930, and also a few days before the trial. His physical findings were negative. He testified that the line on the X-ray picture called a fracture by Dr. Mosely is not a fracture, but the anterior end of the cuboid bone, and that the same line is shown in the picture of the other foot; that a torn ligament would not cause the kind of pain plaintiff claims to have, and the X-ray made by Dr. Mosely does not show arthritis or any disability of the foot. Dr. Rand thought on October 28, 1930, when he examined plaintiff, that he would be well in two months, although he then thought there was a small fracture, which he decided on further examination was not there. He found nothing a few days before the trial to prevent the full use of the foot, and does not think plaintiff has been walking on the side of his foot for the reason that the skin does not show any reaction or callous formation, which would necessarily be if he had walked on the side of his foot from the date of injury to the day of trial.

Dr. Masterson examined plaintiff and made an X-ray of his foot on October 10, 1930. He found no fracture, and found that plaintiff had the normal use of his foot at that time. He tested him by mak-

ing him walk on it, and observed him walking on the bottom of his foot.

Dr. Hines testified there was no fracture, and he thought the foot was only bruised, and considered plaintiff entirely recovered when discharged by Dr. Mecom. He saw the X-ray made by Dr. Masterson, and fully corroborates his findings.

The preponderance of testimony of the doctors is with the defendant, and it is very clear from the testimony of the four doctors who testified for defendant that they think plaintiff a malingerer. To entirely reject his demands would be to so hold; however, the courts are slow to declare one a malingerer, unless it is clearly and conclusively shown, for the reason that a gross injustice might be done to an innocent party. To hold one a malingerer is to hold him to be a perjurer for gain. The district judge undoubtedly took this into consideration in rejecting plaintiff's demands as of non-suit.

The rule of the courts in this state is one of liberality in compensation cases, and, where it is reasonable to believe that evidence might be adduced to prove an injury that was not proved on the trial below, and especially where there is such a wide difference of opinion as to the showing of an X-ray picture, as in this case, we believe it not inconsistent with the rule of liberality adopted by the courts to non-suit the case and not to reject the demands in toto.

We see no error in the judgment of the lower court, and it is therefore affirmed, with all costs.