## NASH v. SOLVAY PROCESS CO.
### No. 5748.

Court of Appeal of Louisiana.
Second Circuit.
March 8, 1939.

Rehearing Denied April 28, 1939.
Certiorari and Review Denied May 29, 1939.

494

Taylor, Porter & Brooks, of Baton Rouge, for appellant.

Wiley R. Jones, of Colfax, and Ward T. Jones, of Alexandria, for appellee.

DREW, Judge.

The defendant is a corporation engaged in the business of mining and crushing rock near Winnfield, Louisiana, and after same is mined and crushed, they are loaded onto railroad cars and shipped to Baton Rouge, Louisiana, for chemical purposes. In connection with the mining and shipping, the defendant has a short line railroad over which cars are transferred to the mine and loaded and then transferred back to the L & A Railroad, where they are then sent out into commerce.

The plaintiff had been in the employ of the defendant company for two or three years as brakeman, and on the 27th of July, 1937, while he was engaged in the discharge of services that arose out of and were incidental to his employment and in the course of his employer's business, he received an injury. The plaintiff contends that while he was assisting in moving one vibrator from one bin to another for load-

ing purposes, he was caught between the lever that opened the bin and the traveling vibrator which was being shoved by a locomotive engine; that he was caught and mashed, receiving an injury to his chest and in the small of the back and was finally somersaulted out over the cars for some distance. He alleges he was permanently and totally disabled by said accident. The injuries alleged to have been sustained by plaintiff are as follows: his tenth rib was broken. He was knocked unconscious and remained so until about eight o'clock P. M., the accident having occurred between eight and nine A. M. That he received internal bruises and abrasions and suffers internally in the region of his intestines. That his gall bladder was injured and as a result fails to function. His liver was injured and bruised and fails to function properly; and that he suffered an injury to his spleen, nerves, ligaments of his chest, intestines and back. That he suffered an injury and strain to the sacro-iliac joint, which gave him considerable pain, and injured his hip joints. It caused a paralysis of his nerves and his digestion has been greatly impaired. That his vision in his right eye is practically gone and the hearing in his right ear impaired. That he suffered permanent injury to the spine and vertebrae; and that all of these injuries were caused by the accident.

It is alleged and admitted that plaintiff was working for thirty-seven cents an hour, working 40 hours a week, making a total of $14.80 per week, and, if the plaintiff is entitled to recover, he is due $9.62 a week during the time of his disability.

There is no dispute but that plaintiff received an injury from an accident which occurred on July 27, 1937, while he was performing his duties in connection with the hazardous business operated by the defendant. The defendant recognizes the injury received from this accident, and permitted plaintiff to cease from his labors for four weeks, at which time he was pronounced well by the doctors employed by defendant. Plaintiff refused to resume his labors for the reason, from his viewpoint, that he was unable physically to perform the duties required of him, and the real issue in this case is to what extent the plaintiff was injured by the accident.

The lower court in a written opinion awarded plaintiff compensation for total disability for twenty-four weeks, less eight weeks, for which compensation had been paid. Plaintiff perfected a devolutive appeal and defendant a devolutive and suspensive appeal.

### Motion to Strike.

At the conclusion of the trial in the lower court, the district judge proposed that he be permitted to take the plaintiff to New Orleans at defendant's expense and there have him examined by a roentgenologist of the court's own choosing. Counsel for plaintiff objected to the proposal for the reason claimed that plaintiff's case had been made out by overwhelming proof; that the proposal was contrary to recognized procedure and would operate against the interests of both plaintiff and defendant. Notwithstanding this objection, the lower judge took the x-ray pictures offered in evidence to a roentgenologist in New Orleans for interpretation. Defendant paid the expenses of the trip. The written opinion of the lower judge shows conclusively that his opinion was based to a great extent, if not entirely, on the information given the court by the roentgenologist in New Orleans, outside of the presence of either plaintiff, counsel for plaintiff or defendant. We make this statement, due to the following excerpt taken from the written opinion:

"After hearing all of the testimony of the experts and other testimony, all of which was very conflicting and confusing, and the judge not being a roentgenologist and unable to interpret the pictures, he informed the plaintiff and the defendant that he would seek some recognized roentgenologist, present him with the x-rays filed in evidence and ask for an interpretation of same, explaining to him that he was neither representing the plaintiff nor the defendant, but was acting as a friend of the court, to interpret these pictures which the court was unable to, and was unable to reach a conclusion from the testimony of the experts on this point. This was agreed to by plaintiff and defendant, and the trial judge took all of the x-rays filed in evidence, went to New Orleans and visited Dr. A. Granger, who is recognized as being high-class and an outstanding roentgenologist. He presented the x-rays to Dr. Granger with the explanation that the other doctors had differed so in their explanation of them that he wanted Dr. Granger's interpretation as to whether they disclosed any injury to plaintiff's bones or

bony structure; and that he approached the doctor as a friend of the court and not representing either side.

"Dr. Granger spent forty minutes interpreting and explaining the pictures, placed them in a shadow box and went into detail in his explanation. After a thorough investigation and examination, he stated that the x-rays disclosed no pathology in the bony structures of plaintiff. The court inquired specifically as to the sacro-iliac joint and Dr. Granger stated that the right apparently had an opening, but that one had to interpret an x-ray picture with reference to the bony structure in connection with this and after doing that, he said there was absolutely no separating of the sacro-iliac; that there might appear to be a narrowness between the fourth and fifth vertebrae in the foramen and this was due to the angle at which the light struck these vertebrae; that as a matter of fact, they were normal and there was no narrowing.

"Dr. Granger took up each detail and to our satisfaction explained that there was no defect or injury to the bony structures complained of; that the vertebrae were not turned or twisted and, if it appeared so, it was due to the manner in which the x-ray was taken. He gave the court a short statement showing he was unable to find that the x-rays disclosed any pathology in the bony structure of plaintiff.

"Dr. Hamilton testified that the foramen between the fourth and fifth vertebrae could be diminished or closed by pressure from the back. The court visited a human skeleton and examined it. It found that the fourth and fifth vertebrae are united together by what is called the articular processes,—two bones, one slightly inside or dovetailing into the other; and the court reached the conclusion that it would be impossible for pressure or traumatism to move these articular processes without a fracture to one of them. The x-rays, as filed and interpreted by both physicians for the plaintiff and defendant, do not show any fracture of these processes, and for that reason the court thinks Dr. Hamilton must be in error in this opinion because plaintiff is a man past forty, calcification is complete and not pliable like the bones of a child; and the court is sure there is no closing of the foramen between the fourth and fifth vertebrae, from the evidence in this case.

"Most of the doctors who have testified in this case state that the foramen vary in size and shape in the same person and also in different persons. The court has read and studied pictures in medical textbooks on this subject and finds that the foramen in the same person vary from top to bottom, not only in size but shape. The court feels that this may explain the various shapes and sizes in the foramen of plaintiff.

"Drs. Mosely, Hamilton and Smith testified to the apparent bulging of the psoas muscle on the left side, and said that was due to the spasms of the muscles. Drs. Barker and Rand disagree with plaintiff's physicians on this point. Dr. Granger stated that this would be going too far. That if a person was lying down to cause spasms of the muscles, which would be causing the bulging, he would then be suffering extreme pain and he disagreed with plaintiff's doctors on this point.

"The court has examined x-ray pictures made of other persons who had sacralization of the transverse process of the fifth vertebra, just as plaintiff has, and in each of these pictures the muscle apparently extends farther out to the left than it did to the right; but Dr. Granger informed the court that this was due to the manner in which the picture was taken.

"After giving a great deal of thought and study to this question, the court has reached the conclusion that the plaintiff has no pathology or trouble in his bony structure and, therefore, there is no permanent and total disability at this time."

The trial of the case was concluded on February 8, 1938. The following report of Dr. Granger was dated March 3, 1938, and filed in the record by the lower judge:

"Judge F. E. Jones,

"8th Judicial District of La.

"Dear Judge:

"I thank you for referring x-ray films for an interpretation. Their examination shows no signs of pathological changes in the lower lumbar spine, the lumbo-sacral and sacro-iliac joints.

"Cordially,

"Armedee Granger, M. D."

In this court plaintiff has filed the following motion:

"On motion of Chester Nash, appellant herein, through his undersigned counsel, and on suggesting to the court:

"1. In the above cause it was suggested by the trial judge, Hon. F. E. Jones, that due to the conflict in the testimony of the experts who testified on behalf of the plaintiff and the defendant, he desired to take the x-rays and submit them to some outside doctor for his interpretation of the same, and that since this was a pauper case the defendant appeared to be the only party who could pay for this service; that thereupon the defendant's counsel offered to finance this trip and pay for the doctor's services.

"2. Mover shows that the Judge went to New Orleans and consulted a doctor for this purpose and that upon receiving a report adversely to the interest of the plaintiff, he filed his report in the record as part of the evidence of the case, and that at the same time he filed his written opinion in which he stated that counsel for both parties consented to this procedure.

"3. Mover shows that instead of consenting to this, his counsel, in open court, opposed the same, and stated that the case was concluded and that plaintiff felt that his case was made out abundantly and that he was willing to stand upon the record as made; that to take this testimony in this manner would be to deny to plaintiff his right to be present and cross-examine the witness, hence refused to consent to the same.

"4. Mover shows that plaintiff's counsel, in open court, further stated that to permit the defendant to pay for this expense would be putting both the plaintiff and defendant in a dubious position, and would not be in line with recognized procedure or fair to either party.

"5. Mover further suggests that, as a reason for not consenting to this method of taking testimony, to have done so would have subjected counsel for plaintiff to criticism from their client; would have been a flagrant betrayal of the trust reposing in them; and would, in the opinion of plaintiff's counsel, have been gross unethical conduct toward the rights of their client; that without impugning the motives of any other party concerned, and fully conceding that their motives were the best, yet the conviction as to the proper conduct of the case on our part remains firm in conformity to the above views.

"6. Mover shows that as soon as his counsel discovered the statements contained in the trial Judge's opinion, they called his attention to the error complained of, and that the Judge immediately corrected his opinion wherein it had stated that this procedure was consented to by plaintiff's counsel, and the original signed statement of the trial Judge is annexed to this motion as a part hereof.

"7. Suggests that the purpose of this motion is to have this court correct and expunge from the record that portion of the trial Judge's opinion in which he stated that the arrangement to take this outside testimony was consented to by counsel for plaintiff, and also to expunge and exclude from this record the statement or opinion of Dr. A. Granger found in the transcript at page 30, and also any reference made to this testimony by the trial Judge in his written opinion as found on pages 257 and 258 of the transcript. That these statements are prejudicial to the rights of the plaintiff, are not properly before the court and have no place in this transcript.

"Wherefore, your mover prays that this court do order this matter referred to in this paragraph 7 expunged and stricken from this record, as not being a proper part of the same, and that upon final hearing herein, that plaintiff have judgment amending the judgment of the lower court and awarding him full compensation for total disability, not to exceed 400 weeks, less what has already been paid, and for medical fees in the sum allowed by law for this purpose.

"Prays for every order necessary, for all general and equitable relief and for judgment according to law.

"Wiley R. Jones
"Ward T. Jones,
"Attorneys for plaintiff
and appellant.

"State of Louisiana, Parish of Grant:

"Personally came and appeared before me, the undersigned authority, Wiley R. Jones, one of the attorneys in the above motion who being first duly sworn, deposes and says that he drew the above motion and that all the facts and allegations contained therein are true and correct; that this motion was not made for purposes of delay but in order that substantial justice may be done.

"Wiley R. Jones.

"Sworn to and subscribed before me on this the 16th day of November, 1938.

"Zena Stevens,
"By Clerk & Ex-officio Notary Public.

"I hereby certify that a copy of the above motion has been duly mailed and served on the attorney of record for defendant in this case, this the 16th day of November, 1938.

"Wiley R. Jones,
"Attorney for Plaintiff
and appellant."

To which is attached the following document, signed by the trial judge:

"Now· into Court comes Judge F. E. Jones, the trial judge in the Eight District Court, as set out above, and suggests to the court as follows:

"1. In the written opinion handed down by me and which written opinion is now filed in the record lodged in this Appellate Court, and, after having conferred with Wiley R. Jones, one of the attorneys representing the plaintiff in the above entitled and numbered suit, it has been brought to my attention that I was in error in the said written opinion in the following respect, to-wit:

"I stated in said opinion that it was agreed by counsel for both plaintiff and defendant that I should be permitted to take the x-ray pictures that were filed in the case to some roentgenologist of my choice for an examination of the said pictures and to obtain from him a reading of the said pictures and a statement from him of his findings from the said pictures; that I was in error in stating that plaintiff's counsel had agreed to do this; that in fact plaintiff's counsel did not consent or agree to this, but stated they were willing to submit the cause on the record as made up, and did not consent to filing additional testimony in the case. ,

"Wherefore, your relator now prays that the Court do consider the written opinion filed by me in the record amended and corrected in the above respect as to plaintiff's counsel having consented and agreed to said arrangement, and in all other respects to remain as written.

"F. E. Jones,
"Trial Judge, 8th D. C."

■ The motion presents to our minds a rather serious question. The Compensation Act, Act No. 20 of 1914, is very liberal in many ways. It does not require that technical rules of pleadings or evidence be adhered to, but does require that all findings of fact must be based upon competent evidence. Paragraph 4 of Section 18 of Act No. 20 of 1914, as amended by Act No. 85 of 1926. It allows the court a wide latitude in attempting to arrive at a just and proper conclusion in a case, but we are not so sure that it is wide enough to allow a judge to proceed as the lower court did in the one at bar, and decide a case upon x-ray evidence heard· outside the court room by the judge alone, after trial had been had, with no right of cross-examination allowed to either plaintiff or defendant and no opportunity given either to rebut the x-ray testimony, which was not given under oath. Counsel for defendant contends that what the lower judge did is fully authorized by our Workmen's Compensation Law and was legal procedure; that the lower judge had the right in law to appoint Dr. Granger to examine and interpret the x-ray pictures after the case was closed·; therefore, he had the right to interview him without appointing him and use his testimony in deciding the case. To support his contention, counsel relies upon paragraph 3 of Section 9, Act No. 20 of 1914, as amended by Act No. 38 of 1918, which provides as follows:

"If there be any dispute thereafter as to the condition of the employee, the Court, upon application of either party, shall order an examination of the employee to be made by a medical practitioner appointed by the Court. The fees of such examiner shall be fixed by the Court at not to, exceed ten dollars, and shall be paid in advance by the applicant. Such medical examiner shall report his conclusions from such examination to the Court, and such report shall be prima facie evidence of the facts therein stated in any subsequent proceedings under this act."

■ In order to correctly interpret the above quoted paragraph, it is necessary to consider the two preceding paragraphs of that section, viz., one and two. The three paragraphs should be read together. The first two provide as follows:

"Be it further enacted, etc., That an injured employee shall submit himself to examination by a duly qualified medical practitioner provided and paid for by the employer, as soon after the accident as demanded, and from time to time thereafter, as often as may be reasonably necessary and at reasonable hours and places, during the pendency of his claim for compensation or during the receipt by him of payment under this act.

"It shall be the duty of the employer to cause such examination, provided for in paragraph 1 of this Section to be made of

the injured employee immediately after knowledge or notice of the accident and to serve a copy of the report by his medical practitioner of such examination upon the employee within six days after such examination. If no such examination be made and report furnished by the employer within that time, the employee shall furnish a report of the examination made by his medical practitioner to the employer, for which the employee shall be entitled to receive from the employer the sum of one dollar. Upon the receipt by either party of such a report from the other party, the party receiving it, if he disputes such report evidence of the facts therein stated in subsequent proceedings or any statement therein, shall notify the other party of that fact within six days, otherwise such report shall be prima facie under this act."

When the three paragraphs are read together, it is evident to our minds that they refer to and provide for certain procedure prior to trial. The Act does not give the court the right to appoint experts without an application from either plaintiff or defendant. However, we are of the opinion that such a practice on the part of the court has now become a recognized custom and right.

The first paragraph provides that an injured employee shall submit himself to examination by a medical practitioner secured by his employer as soon after the accident as demanded and from time to time thereafter. The second paragraph makes it the duty of the employer to have said examination made, as is provided for in the first paragraph, and to serve a copy of the report by the examiner upon the employee within six days thereafter. If the employer fails in this duty, the employee shall furnish the employer a report made by his medical practitioner. When either of the two above mentioned reports have been served, as provided in this paragraph, it is incumbent on the party served with the report, if he disputes the correctness of it, to so notify the party serving it, within six days after it is received, otherwise the said report shall be prima facie evidence of the fact it recites.

The third paragraph, which immediately follows, provides that if there be any dispute between the employer and employee thereafter as to the condition of the employee, the court upon application of either party shall appoint a medical practitioner to examine the employee. It

is to be noted that only one, "a medical practitioner", is authorized to be appointed. The fee of such expert is fixed at $10 and must be paid in advance by the applicant. The report of such examiner is made prima facie evidence of the facts contained therein at any subsequent proceeding.

Our interpretation of the word "thereafter", used in this paragraph, is that it means if there is a dispute between the employer and employee, based upon the report of the medical examiner at the employer's request, or if it fails to have such examination made, over the report of the examiner who made the examination at employee's request. Or if there is no dispute at the time between the employer and employee as to the employee's condition, and compensation is paid, and it should develop later on that the employer is convinced that the employee has again been made whole, and a dispute should arise between them as to his condition, then either party could apply to the court to appoint an examiner, as provided in this paragraph. All of this necessarily would have to take place before trial was had.

It is to be noted that the medical report of the examiner appointed by the court is made prima facie evidence of the facts therein stated in any subsequent proceedings. Prima facie evidence can always be rebutted and, if successfully done, destroyed. It can not be rebutted in the appellate courts. It must be done in the district courts, and where the Act says subsequent proceedings, it plainly means proceedings in the district courts. There are no subsequent proceedings in the district court after the case is closed and submitted. This clause in the Act is sufficient to make it clear that the appointment by the court of medical examiners must be before trial is had in the district court.

We know of no way of construing the third paragraph relied upon by defendant so as to hold that it gives authority to the district judge to appoint a medical examiner to examine plaintiff or x-ray pictures of him after the case has been tried and submitted, and to base an opinion on the report made by said examiner without giving either litigant an opportunity to cross-examine or to rebut his report.

██ The examination authorized by the Act is of the employee. In no instance does it authorize the appointment of an expert to pass upon the correctness of some evidence which was offered on the trial of the case, as was done in the one at bar. Courts are required to try and decide cases upon the evidence adduced on trial and are not authorized to decide them upon evidence ascertained by the court outside of the court room and not placed in evidence, so as to permit scrutiny and contest. This rule is laid down in no uncertain terms in the case of Interstate Commerce Commission v. Louisville & N. R. Company, 227 U.S. 88, 33 S.Ct. 185, 187, 57 L.Ed. 431, 434, wherein the Supreme Court of the United States said:

"The government further insists that the commerce act (26 Stat. at L. 743, chap. 128, U.S.Comp.Stat.1901, p. 3163 [49 U.S. C.A. § 12 and note]) requires the Commission to obtain information necessary to enable it to perform the duties and carry out the objects for which it was created; and having been given legislative power to make rates it can act, as could Congress, on such information, and therefore its findings must be presumed to have been supported by such information, even though not formally proved at the hearing. But such a construction would nullify the right to a hearing,—for manifestly there is no hearing when the party does not know what evidence is offered or considered, and is not given an opportunity to test, explain, or refute. The information gathered under the provisions of § 12 may be used as a basis for instituting prosecutions for violations of the law, and for many other purposes, but is not available, as such, in cases where the party is entitled to a hearing. The Commission is an administrative body and, even where it acts in a quasi judicial capacity, is not limited by the strict rules, as to the admissibility of evidence, which prevail in suits between private parties. Interstate Commerce Commission v. Baird, 194 U.S. 25, 24 S. Ct. 563, 48 L.Ed. 860. But the more liberal the practice in admitting testimony, the more imperative the obligation to preserve the essential rules of evidence by which rights are asserted or defended. In such cases the Commissioners cannot act upon their own information, as could jurors in primitive days. All parties must be fully apprised of the evidence submitted or to be considered, and must be given oppor-

tunity to cross-examine witnesses, to inspect documents, and to offer evidence in explanation or rebuttal. In no other way can a party maintain its rights or make its defense. In no other way can it test the sufficiency of the facts to support the finding; for otherwise, even though it appeared that the order was without evidence, the manifest deficiency could always be explained on the theory that the Commission had before it extraneous, unknown, but presumptively sufficient information to support the finding. United States v. Baltimore & O. S. W. R. Company, 226 U.S. 14, 33 S.Ct. 5, 57 L.Ed. 104."

In a compensation case arising under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq., Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 291, 76 L.Ed. 598, the Supreme Court of the United States said:

"The statute provides for notice and hearing, and an award made without proper notice, or suitable opportunity to be heard, may be attacked and set aside as without validity. The objection is made that, as the deputy commissioner is authorized to prosecute such inquiries as he may consider necessary, the award may be based wholly or partly upon an ex parte investigation and upon unknown sources of information, and that the hearing may be merely a formality. The statute, however, contemplates a public hearing and regulations are to require 'a record of the hearings and other proceedings before the deputy commissioners.' Section 23 (b), 33 U.S.C.A. § 923(b). This implies that all proceedings by the deputy commissioner upon a particular claim shall be appropriately set forth, and that whatever facts he may ascertain and their sources shall be shown in the record and be open to challenge and opposing evidence. Facts conceivably known to the deputy commissioner, but not put in evidence so as to permit scrutiny and contest, will not support a compensation order. Interstate Commerce Commission v. L. & N. R. Company, 227 U.S. 88, 93, 33 S.Ct. 185, 57 L. Ed. 431; Chicago Junction Case [Baltimore & O. R. Company v. United States], 264 U.S. 258, 263, 44 S.Ct. 317, 68 L.Ed. 667; United States v. Abilene & S. R. Company, 265 U.S. 274, 288, 44 S.Ct. 565, 68 L.Ed. 1016."

██ It is clear to us that any facts or opinion given to the lower judge by Dr. Granger in New Orleans cannot legally be

the basis for a judgment in this case. What he said to the judge is not in the record and we are powerless to review testimony that is not in the record. If the procedure indulged in by the lower court in this case were upheld, it could as well he extended to this appellate court, since it is our prerogative to pass upon facts as well as law. We are no more versed in or qualified to read and interpret x-ray pictures than is the lower court. What would be the result if we should call in an expert in that line who would interpret the pictures differently from the way Dr. Granger did? He would be our expert and we would naturally follow his finding. What then would be the use of trial where the only issue, as in this case, is the present condition of plaintiff? Why not submit plaintiff to the judge and authorize the judge to have him examined by physicians of his own choosing and render his opinion without the expense and delay of a trial? The procedure followed by the lower court in the case at bar is not different, except there was no authorization or agreement on the part of plaintiff for the judge to take the testimony of Dr. Granger.

We are sure that the error of the lower court was through a desire to find the true facts and to render a just decision, and that his motives were pure and honest but, in our opinion, his desire to find the truth caused him to make an error we will be forced to correct.

The motion to strike filed by plaintiff is sustained, and the testimony of Dr. Granger, relied upon by the lower court as the basis for its decision, will not be considered by us.

### On the Merits.

The sole contention of defendant is that plaintiff had fully recovered from the injuries he received in the accident at the end of eight weeks thereafter, and that since that time he has feigned or faked his suffering. In other words, he is a malingerer.

A review of plaintiff's history as an industrial worker prior to the date of the accident, coupled with his reputation for truth and veracity and general reputation for honesty, will have a bearing upon whether or not he would likely perpetrate the fraud contended by defendant. To hold that plaintiff is a malingerer is to hold him to be a perjurer for gain, and courts are slow to declare one a malingerer and will not, unless it is clearly and conclusively shown, for the reason a great injustice might be done an innocent party. Yelverton v. Louisiana Central Lumber Company, 19 La.App. 21, 138 So. 684; Green v. National Mfg. & Stores Corp., La. App., 159 So. 412; Doane v. Board of Commissioners, La.App., 163 So. 717.

Plaintiff began work for the L. & A. Railway as a brakeman in 1916. He continued in this employment until he joined the army of the United States during the World War. After the war he returned to his former job and continued as a brakeman until 1934. His earnings during this time averaged $150 per month. Throughout the duration of this employment, he received injuries in three accidents. He reported them in each instance and was given treatment by the company's physicians. In each instance, as soon as pronounced well, he returned to his job. He did not file suit for compensation in either of the instances and signed releases upon being paid his straight time for the period he was unable to work.

Plaintiff's first accident was on October 31, 1930, at which time he was jerked or thrown off of a box car, which caused him to suffer with his stomach, left leg and left side all the way up to his neck. On July 21, 1931, he stepped on a broken fruit jar and cut his right foot severely. On November 16, 1933, he got something in his left eye which caused him to lay off for approximately two weeks to be treated.

Soon after plaintiff left the L. & A. and approximately three years prior to the date of the accident, he was employed by Palmer, Wolf & Gray, former operators of the quarry. He continued to work for them until the defendant herein acquired the quarry. The work he performed was heavy, manual labor. When defendant took over the quarry it had plaintiff, together with other employees, examined by its physicians, Drs. Fitts and Faith, at Winnfield. Plaintiff's examination disclosed him to be a healthy, robust man, with no defects of any kind in his physical makeup. This was less than two years prior to his injury. He continued to work for defendant until he was injured in the accident of July 27, 1937. Since that date he has not worked at any job and contends that he is unable to do manual labor, the only kind of work he can do.

Five outstanding, reputable, white citizens of Winnfield have testified as to plaintiff's character. They all stated his reputa-

tion for veracity, paying his debts and for being a conscientious worker was good. A reading of their testimony convinces us he had the respect of these white citizens.

No evidence was offered by defendant to refute this testimony.

A summary of the above testimony as to plaintiff's history as an industrial worker and his character is as follows:

He had worked as an industrial worker for 21 years, with few lay-offs; had been injured three times, all of which were compensable. His wages at the time were sufficient for him to have received the maximum amount of compensation allowed by the Act, yet he has never before filed a suit for compensation and each time returned to work as soon as the company's physicians ordered him to do so. His reputation for veracity is good and also for paying his honest debts, and he has the respect of the citizens where he lives.

With these undisputed facts before us, it will take evidence strong enough to conclusively prove that he is a malingerer before we would be justified in so finding; and certainly evidence of medical experts alone, which is contradicted in every respect by other medical expert testimony, and all the medical testimony emanating from medical experts of equal standing is not sufficient to conclusively prove that plaintiff is a malingerer. No lay testimony of material importance was offered by defendant.

Plaintiff offered 12 x-ray pictures, 6 made by Dr. Mosely and 6 by Dr. Hamilton. Defendant offered 10 made by Dr. Barker, making a total of 22 x-rays.

Dr. Mosely testified that upon examination of plaintiff and from the x-rays he made of him, he found the following:

That he had spasms of the muscles of the back, a negative Wassermann, blood and pus in the urine, and he passed at least a pint of red blood while in the clinic the first time. On his second trip to the clinic, he passed at least another pint of blood. The doctor did not find any hemmorrhoids, but found a tenderness in the upper region of the gall bladder; found the left kidney out of order. There was a mass in the left kidney and the right has had to do all the work. He believes the kidney has been lacerated. It is practically functionless and the blood, pus, albumen in the urine were the result of injury to the kidney. The x-rays showed an increase in the opening of the sacro-iliac joint on the right and showed

the spine is twisted toward the right. The sacrum looks like it has been pulled or pushed over. The fourth lumbar vertebra tilts to the left and the fifth toward the right. The fifth lumbar vertebra rests on the sacrum and there is a fracture on the right side. On the right side there is a sacralization of the transverse process of the fifth lumbar vertebra on the left. The transverse process is resting on the sacrum and against the ilium and is pressing that side of the spine. There is a rotation of the spine between the fourth and fifth lumbar vertebrae and the sacrum.

Dr. Mosely thinks the left kidney was ruptured in the accident; that the spasms of the muscles of the back are involuntary. Plaintiff has no control over them. He is totally disabled. The x-rays further disclose a fracture of the third lumbar vertebra. The injury to plaintiff's eye and ear could have been caused by the accident, because of the amount of pressure on plaintiff. He also found a damaged gall bladder.

Dr. Mosely testified that the treatment plaintiff needed would more than consume the $250 allowed by the Compensation Act. On cross-examination, when presented with a picture made by Dr. Barker, Dr. Mosely said:

"It shows the intervertebrae foramen plainer than mine, that hole we are talking about, it is as plain as writing on the wall that there is a change in the size and shape of the intervertebrae foramen."

Dr. Hamilton testified from his x-ray plates and clinical examination of plaintiff as follows:

"Q. Please state to the court what your findings are with reference to that picture? A. In this film, which is an anterior-posterior view of the upper portion of the pelvis and of the entire lumbar spine, there is in the first place a widening of the right sacro-iliac joint particularly noticeable in this upper portion here. There is a sacralization of both transverse processes of the fifth lumbar vertebra. The sacralization is particularly evident on the left side. There is also a marked bulge on the left psoas muscle on the left, as compared to that on the right and the lateral side of the psoas muscle extends in the x-ray films from the first lumbar vertebra downward to the brim of the pelvis on the right side set on a line practically straight. On the left there is a marked bulge and interpolation of this as far as contraction of the left psoas muscle.

That is all I see in this film, marked plaintiff 8, except for the evident rotation in the vertebral body in the lumbar region. This rotation was particularly marked at the third lumbar vertebra, becoming less marked in a downward direction and less marked in an upward direction. In other words, the point of the greatest rotation was the third lumbar vertebra. Rotation of that sort is determined by the amount of the part of the vertebra which is on one side by the amount on the other side of the middle line. If we take the spinus process as a middle line, the amount of the mass of the body which is to the left is much greater than that to the right in the third lumbar vertebra. This is less marked in the fourth lumbar vertebra. It is also less marked in the second. It is almost absent in the first lumbar vertebra and is practically absent in the twelfth thoracic vertebra. But since the film does not show that vertebra clearly, an interpretation should not be made from this film. In that region rotation of all or single segments or isolated segments could only occur from muscle spasms. It could not be voluntary. It is utterly impossible for a person to rotate the third and fourth vertebrae on upward or downward through their own will. Spasms of the psoas muscle and spasms of the ——— muscles can cause rotation.

"Q. What in your opinion, Doctor, could have caused these conditions? You have heard the testimony of the witnesses in the case thus far? A. Trauma could cause it and is the only logical explanation, because of the separation of the sacro-iliac joint. The sacralization is congenital, but injury frequently causes a sacralization to become painful and pain may be present on the same side as sacralization, but it may be on the other side. The explanation for that is that there are attachments of the transverse process to either the sacrum or ilium the body and other transverse process if you have trauma it acts as a lever of the second order which is a brace and with the sacralized part as ——— made to move slightly in any direction. The rotation of the body of the vertebrae as I say are by involuntary muscle spasms. Involuntary muscle spasms are most frequently caused by pain. As I said the spasms are involuntary and could not be continued from any act he might perform."

Dr. Hamilton was not certain whether the fractures found by Dr. Mosely were there or not. He further testified as follows:

"Q. Besides causing the rotation of these various vertebrae, what will the contraction of that psoas muscle do? A. It will cause a tendency for the thigh to be flexible and externally rotated, the position of the flexion is that of binding the thigh from the body the position of external rotation is that in which the joints and bones go away from the body.

"Q. Go ahead, Doctor. A. I now take the film marked plaintiff 9. This gives a lateral view of the lumbar and sacral spine of the plaintiff. The film marked plaintiff 9 shows a definite narrowing of the fourth lumbar intervertebral foramen. The foramen is a hole through which a nerve and all blood vessels pass. I suspect a smaller or more marked narrowing between the fifth lumbar vertebra and the first dorsal vertebra, but again the film that I have are not clear enough to be certain that the narrowing about is there. That is all I see in the lateral view.

"By the Court:

"Q. What is the cause and effect of that narrowing hole there? A. We have a joint here. This line here is the line of the joint and it is called the interarticular faucet. The joint is formed by the superior articular processes from the vertebrae below joining or articulating with an inferior articular process from the vertebra above. If due to any severe injury, the capsule or ligaments around these joints are drawn over and it has a tendency to slide by in this manner. * * * The inferior articular process occupies more than its share of this area and the large spinal nerve emerging from the foramen here. The fourth and fifth are the two largest of the spinal nerves. The fifth is the largest of all. It is normally the smallest foramen to get through so any slight distance in relation between the articular processes either in the fourth and more so in the fifth, it might tend to cause a gradual pressure on the nerve like this.

"By Mr. Jones:

"Q. Now, Doctor, in view of your findings, what have you to say as to whether or not the disability of the plaintiff complained of could be caused by that closing up of the foramen? A. The closing up of the hole would cause it, and in my opinion this causes all of the trouble as what I diagnosed as the trouble in Chester's left leg.

"Q. You figure the nerve is more or less pinched? A. There are two foramen,

504

one on each side, and out of which one comes the spinal nerve. One goes downward on one side and the other down the other. There is no way of telling from this film whether this sliding is on the left or the right side or both, but from the clinical examination when we find a diminution in the reflex of the left leg, we presume the sliding by is on the left side.

"Q. Doctor, you heard the testimony as to the nature of the injury to plaintiff. State as to reference to this injury whether or not * * * that when he received an injury by a lick in the small part of the back that this kind of an injury could cause the condition you have described? A. As I understand from my examination of Chester, one blow was received on the chest and another on the lower part of the back.

"Q. If he received a severe lick in that region state whether or not if in your opinion it could have caused that condition or injury you have just described? A. The type of injury that Chester received is actually the type of injury that causes the sliding by. It is hyper-extention injuries which incur from backward bending. Injuries from bending his flexons it would normally be impossible to cause his injury by flexon, but if the spine is bent backward, then at least the articular processes would become involved.

"Q. So if he was crushed in the back as the evidence shows you would say that would cause this kind of an injury? A. Yes, sir.

"Q. If you were to entirely disregard the injury and pathology you found in the other picture, state whether or not the findings in this picture, this sliding by on the left side would cause the trouble you found on a clinical examination of the plaintiff? A. This type of injury by itself can cause total disability.

"Q. State whether or not this plaintiff is disabled? A. He has a permanent injury, as far as his present situation is concerned.

* * *

"Q. Isn't all this explanation you have just given mostly theory and cannot be proven? A. Absolutely not, the film demonstrated absolutely the fourth intervertebral foramen. I have stated before that I suspect it in the fifth but would not diagnose it. The trouble in the fourth

could cause the total disability without having anything in the fifth.

* * *

"Q. I would like to ask you if the condition that you make mention of there might be due to arthritis caused by a focal infection? A. If there had been an arthritic condition I would have made the diagnosis. There is no suggestion of arthritis of the fourth intervertebral passage or any of the others which are clear in this film.

"Q. Then you attribute what you see there, entirely to the injury which this darky told you he had in 1937? A. As I stated a while ago, the injury is the only thing which could cause this condition in the absence of other signs or trauma to other parts of the bone.

* * *

"Q. Go ahead, Doctor. A. This is a film marked 8925 A taken by Dr. Barker and attached to his deposition. This shows the same separation of approximately the same extent in the right sacro-iliac joint. The sacralization is shown on both of these films. The rotation of the vertebral body is also shown and there is also the bulging in the amount of * * * in the psoas muscle when compared to the right side.

"Q. Does that bulging confirm your diagnosis? A. Yes, sir.

* * *

"Q. What did your physical examination disclose? A. From the physical examination there was marked spasms of the muscles on each side of the spine in the lower part of the back. There was a flexon of the external region of conformity of the left leg. There was a tenderness over the lumbar sacral region which is that region where the lumbar spine joins the sacrum. There was a tenderness in the ligaments on both sides of the lower part of the lumbar spine and of the sciatic nerve in the left leg. That is a summary of the examination I made."

He further testified as follows:

"A. There is no way a man can cause voluntary spasms of the muscular parts of the body in such a way that it causes rotation in view of the bodies of the vertebrae. There is no way a man could with the spasms for any length of time. Say for a period of an hour it would tax any normal individual beyond the limits of

their endurance. The examination of Chester occupied a great deal more than an hour, and at the end of that time the muscles were as hard as when he was first examined superficially."

Dr. Smith, a physician specializing in x-ray diagnoses, testified that plaintiff had an almost completely non-functioning gall bladder; that it was possible but improbable that the injury to the bladder was caused by a trauma. His interpretation of the x-ray pictures was the same as that of Dr. Hamilton. That the x-rays clearly show a marked difference in the area or size of the intervertebral foramen in between the fourth and fifth lumbar vertebrae and the first sacral vertebra, which could result in the pinching of the spinal nerve making its exit through the foramen and resulting in disability from the disturbance of the nerve involved, which goes to the lower extremity; that the narrowing of the foramen was caused by the disruption of the ligaments and tendons in the articular process and was the result of a rather severe traumatic injury. There was no arthritis present to cause the diminution in the foramen.

Dr. Woodall examined plaintiff on the day of trial and was of the opinion he was totally disabled.

Dr. John T. Mosely made several examinations of plaintiff, with the aid of the x-ray pictures and came to the same conclusion as to his injuries and the cause of them as did Drs. Hamilton and Smith. He found plaintiff totally disabled for the following reasons: 1. The history. 2. The clinical findings; and 3. the x-ray agreements or conformation with the history and clinical findings.

The medical testimony offered by the defendant consisted of seven physicians and roentgenologists. Drs. Fitts and Faith are in defendant's employ to care for any employee who receives an injury. Plaintiff was carried to their clinic soon after he was injured and examined by both of them. Dr. Fitts testified that plaintiff was fairly conscious and badly frightened and suffering considerable pain when he saw him. He found no blood or contusions and no broken bones. In fact, he found nothing the matter with him. He gave plaintiff a shot of morphine and sent him home. Dr. Fitts said plaintiff only complained of his chest hurting him and nothing else. He remained in bed five days and got up. He walked like he was sore and on the sixth day came to his office. He thought plaintiff was able to go back to work at the end of four weeks, but did not discharge him until the end of the eighth week; that he examined plaintiff again after suit was filed and found nothing wrong with him, except hemorrhoids. He is of the opinion plaintiff is a malingerer. He could find no rigidity of muscles in his back or leg. He discharged plaintiff as well upon his own examination and the report on the x-ray finding by Dr. Barker.

Dr. Faith testified that when plaintiff was brought into the clinic, he was conscious and told then how the accident occurred. He complained of his back and abdomen hurting him. The remainder of his testimony is the same as that of Dr. Fitts and he thinks plaintiff is a malingerer. His finding, other than the external examination made in his clinic, is based upon the report given him by Drs. McBride and Barker.

Dr. McBride testified that the blood plaintiff passed came from his hemorrhoids and did not come from a higher region. His partners, Drs. Hardy and Pearce, assisted in the examination made of plaintiff. They called on Dr. Barker to make x-rays of plaintiff and report his finding, which he did. The x-ray findings to which they testify are based entirely on Dr. Barker's report. They only found plaintiff to be suffering from hemorrhoids and wanted to operate and remove them, but at the last minute, upon the advice of his wife, plaintiff refused to have the operation. He further testified that plaintiff went from the bed to the toilet in a hurry and did not drag his left leg; that he greatly exaggerated his pain when being examined or feigned pain he did not have. He also found plaintiff with bad teeth, and a slightly enlarged prostate.

The second examination he made of the plaintiff was in January, 1938. At that time plaintiff complained of pain in the chest, back, left leg, loss of vision in the right eye and an impairment of hearing in the right ear. He called on Dr. Noel Simmonds to examine the eye and ear. Dr. Simmonds concluded plaintiff was not suffering from any injury due to the accident. In reply to questions propounded by the trial judge, he testified as follows:

"Q. These spasms or muscles that they spoke about were down over in the region of the fourth and fifth lumbar vertebrae, and you didn't find any spasms down there?

A. Yes, I did; he had spasms over that area and he also had them over his chest and abdomen; now there is a muscle and psoas major muscle that runs on the inside here, down, and I think any competent roentgenologist would testify that it would be hard to make a picture of that muscle. I would like to show you a picture here in a book, the muscle is attached and runs down and attaches to the inside of the head of the thigh bone and you cannot palpitate it.

"Q. The closing of that foramen between the fourth and fifth vertebrae, would that have caused the muscles that go through there to contract and have spasms? A. You mean the nerve supply?

"Q. I mean would that cause any spasms of the muscles out there on the left side? A. Judge, you mean the nerve that comes through the foramen?

"Q. Yes. A. It would cause a spasm of the muscles controlled by that nerve, this nerve goes down the thigh and down to the toes way down and you would simply have spasms of the muscles controlled by that nerve, that goes back to some of that chiropractic stuff.

"Q. I am asking you these questions in view of their testimony? A. Furthermore, the x-ray would have to show some evidence of that being smaller.

"Q. I cannot read the x-ray pictures that were introduced by the plaintiff's doctors yesterday, and three doctors in reading the x-rays testified that there was a hole in the foramen that had been decreased in size, which they said could be done by trauma, what have you to say to that? A. Yes, sir, it would produce spasms of the muscles supplied by that nerve and could do that.

\* \* \*

"Q. Could you or not tell whether the spasms of the muscles were voluntary or involuntary, largely upon the extent of time over which they existed, is it not impossible for a person to hold himself or his muscles tense for any period of time? A. I don't believe a man could voluntarily hold his muscles tense over a long period of time, but you would have to be with him continuously to tell."

Dr. Barker, a roentgenologist, testified to the following:

That all ten x-ray films showed negative, with reference to any injury to plaintiff of any tissues involved; that they showed no injury to the chest, ribs and colon; there is no difference in the width of the right and left sacro-iliac joints; no fracture is shown, the foramen is not small between the fourth and fifth lumbar vertebrae and is not reduced in size, but is normal. He found a sacralization of the transverse process of the fifth lumbar vertebra on the left and a tilting of the spine to the right. He explained that sacralization of the transverse process as being congenital, and means that the transverse process of the fifth lumbar vertebra unites with the joints of the ilium. This sacralization might produce spasms of the psoas muscle and it might produce a limp or tilting of the vertebra; and if a person has sacralization of the transverse process and received a trauma sufficient to dislocate the transverse process from the joining of the ilium, it would injure the person.

Dr. Barker found nothing wrong with either kidney or the spleen, and no bulging of the psoas muscle; the spinus process to be normal; no separation of the sacro-iliac joint; and no mass in the abdomen. He admitted the foramen between the fourth and fifth lumbar vertebrae is smaller than those above, but states it is normal and should be as it is. He examined all x-rays filed by plaintiff and testified that none of them showed any pathology. Dr. Barker disagreed with Dr. Hamilton, who testified that the narrowing or closing of the foramen between the fourth and fifth lumbar vertebrae would be sufficient to cause all the trouble plaintiff is having in his left leg. The transverse process on the left side of the fifth lumbar vertebra could be dislocated without a fracture, provided there was no bony union and a sacralization mass and union. It is not always a bony union; it might be either by tissue or bony structure. The x-ray films do not indicate it has been dislocated. Dr. Barker further testified on this point as follows:

"Q. Assuming, hypothetically that such should be the case and there should be a breaking loose of the sacralization and a separation from the processes and the ilium, what would you expect to follow that? A. I don't know what you mean by follow.

"Q. What pathology would result if an injury to that sacralization would cause it to break loose? A. You might have pain and there are signs or symptoms that

would indicate that there was some injury there.

"Q. Wouldn't it cause one to limp or drag his leg? A. It would not cause him to drag his leg, it might cause him to limp.

"Q. It wouldn't create any muscle spasms? A. Yes, it might create muscle spasms.

"Q. You found no such condition to exist by your films or the films made by others? A. No, sir.

"Q. In your opinion, has there been any separation or breaking away or loosening of the sacralization on the left side of Chester Nash? A. No, sir."

Dr. Noel Simmonds, an eye and ear specialist called in by Dr. McBride to examine plaintiff, testified that plaintiff could hear out of the right ear and was feigning when he claimed he could not. He went into detail in explaining a malingerer's test he gave him which he claimed never fails; that plaintiff's vision in the right eye is limited to hand moving or counting fingers. He has not over five or ten per cent vision in the right eye. He claims it is due to inflammation of the choroid and retina. It is a condition of several months' duration and possibly several years. It is not due to trauma. His examination of plaintiff was made six months after the date of the accident. Dr. Simmonds is of the opinion the eye trouble was caused by some focal infection, but could have been caused by trauma, if sufficient to raise the blood pressure and cause hemorrhage; focal infection in the kidney, gall bladder or liver could cause the condition of the eye. He testified further that plaintiff has a degree of impairment of hearing in the right ear.

Dr. Hardy, a partner of Dr. McBride, examined plaintiff with his partner. The only thing found wrong with plaintiff was hemorrhoids, bad teeth and a defective eye. He found no pathology which would cause him to limp or drag his left leg. He considered plaintiff a malingerer. His examination showed nothing wrong with plaintiff's gall bladder. The liver was functioning normally; nothing wrong with the spleen; in fact, his testimony is that from the clinical examination he made, taken together with the x-ray pictures made by Dr. Barker, plaintiff is a malingerer and is suffering no injury that could disable him from doing manual labor.

Dr. Rand testified that plaintiff attempted to exaggerate the symptoms he felt. He walked with a limp; and there was a variation in his gait in that with every step he did not drag his toe. He thought it was an assumed gait. He found nothing wrong with plaintiff, except the hemorrhoids, infected gums, and a defective eye. In making his examination he relied upon the hospital reports, the x-rays made by Dr. Barker and his own physical examination.

An analysis of the medical testimony discloses there were three doctors, qualified to interpret x-ray films, who testified for plaintiff and found many abnormalities in the back and are positive they were caused by severe trauma. For the defense there were two doctors qualified in this line who testified that there is nothing abnormal shown in plaintiff's back by the x-ray films. The other doctors who testified for the defense did not testify from the x-ray films, but accepted as correct the report made thereon by Dr. Barker. Three doctors for plaintiff testified that there was a narrowing or closing of the foramen between the fourth and fifth lumbar vertebrae; that it was caused by trauma and was impinging the nerves which run down the lower extremities. Only one doctor for the defense denied this was true. Dr. Rand was not asked that question. It is admitted, if that be true, it would affect plaintiff just as he claims to be affected.

We have to take into consideration that the accident in which plaintiff was injured was not a slight one. He was crushed between two objects, one striking him in the breast and the other in the small of the back, with the force of a moving railroad locomotive behind one of the objects, and that he was also catapulted from a car to the ground in an unconscious condition. We have to take into consideration also the fact that plaintiff was a healthy, robust man, regularly performing hard, manual labor up until the very moment of the accident, and has not worked since, because of disability resulting from said accident. When we consider plaintiff's past history and his reputation, which we gave in the beginning, we cannot discard entirely his testimony as to his disability and pain, although it is true that he did exaggerate the pain he claimed to suffer from some of his alleged ailments, especially the pain in his chest; and must consider the lay testimony given by reputable citizens to the effect that since the accident plaintiff

has always walked with a stick, with a decided limp in the left leg and more or less dragging his left foot. Also the testimony of Dr. Mosely, of Winnfield, that he has on several occasions been called to plaintiff's home and administered opiates to relieve his pain.

The divergence of opinion among the doctors in this case, as in all others of a like kind, is regrettable, but in cases of this kind, if compensation were not allowed because of the conflicting opinions of the doctors, there would never be a case in which a compensation claimant could or would be awarded compensation.

Insofar as the total disability is concerned, we can eliminate from consideration plaintiff's ear and eye, as well as the kidney, spleen and gall bladder.

We are convinced that plaintiff has a serious injury in his back; that there is a widening of the sacro-iliac joint and a narrowing or closing of the foramen between the fourth and fifth lumbar vertebrae, which is impinging the nerves going down the left leg; a possible dislocation of the sacralization of the fifth lumbar vertebra; that it was caused by trauma received in the accident; and that plaintiff was totally disabled at the time of the trial below. We infer, from the judgment of the lower court, that it did not accept as correct the testimony of the doctors offered by defendant for, if it had, it would have rejected plaintiff's demands in toto. It likewise did not accept the testimony given by plaintiff's doctors, for if it had, it would have awarded judgment for total, permanent disability and not have awarded judgment for twenty-four weeks' compensation.

There is no evidence to justify an award of twenty-four weeks' compensation, for it is admitted that if the injury to the back is as we have found it, it will be permanent. The judgment should have been for a period of disability not to exceed 400 weeks, less the eight weeks' compensation paid. Plaintiff was also entitled to receive the amount he had expended for treatment. The record discloses he incurred a bill for medical treatment with Dr. Mosely in the sum of $71; $15 additional for x-ray examinations; and with Dr. W. L. Smith a bill for $15 for x-ray examinations, making a total of $91.

It therefore follows that the judgment of the lower court will have to be amended by increasing the term of twenty-four weeks fixed therein to not exceed 400 weeks, and awarding plaintiff $91 for doctors' bills incurred, with legal interest on the $91 from judicial demand and upon each weekly compensation payment from the day it was due until paid; and for all costs of this suit; and it is so decreed.