## Black Mountain Corporation v. Williams et al.

March 15, 1946.

James Sampson for appellant.

Golden & Lay for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Affirming.

The question at issue is whether there is evidence sustaining the finding of the Workmen's Compensation Board that W. R. Williams, a miner, died as the result of inhaling poisonous gases produced by smoking insulation on an electric cable. The appellant employer contends that the claimants for compensation did not sustain the burden of proving a compensable death and that it established the employee's death to have been due to a heart attack.

Williams and three other men were at work in a recess of one of the appellant's mines when an electrically charged cable became short circuited and the insulation took fire. There was a great volume of heavy smoke containing carbon monoxide, sulphur dioxide and carbon bisulphide. The three other men got out of the smoke very quickly, but Williams remained in it perhaps ten or fifteen minutes longer while trying to get a blower fan, 40 or 50 feet away, to operate. It appears that the fan was attached to the cable and it would not work, but that fact is not material. The point is that the man remained in the smoke a considerable period of time. All of the men went to an entry in the mine which was free from smoke, and remained there for perhaps half an hour and until the place of work had cleared. Although there is some testimony to the contrary, the evidence tends to prove that the mine was properly ventilated, there being another fan near by. They resumed work for a few minutes and then went to another

place to eat their midnight dinner. Upon returning again to the face of the coal to work, all of them were sick. Williams complained greatly of a pain in his chest and was able to do but little work. He said he had stayed in the smoke too long; that "the smoke got me"; that he was so sick he "couldn't stand it," and was "sick enough to die." The man was cramping, with his hands on his breast, his tongue sticking out, and his head rolling about. He was very much nauseated. The three other men were also made sick and suffered from pains in the head and chest, which lasted for some time and until the next morning, but they had kept on with their work. Williams was taken out of the mine on a car. During the journey of about three miles to the outside he was tossing about, sick at the stomach, and complainingly greatly. On the outside he walked to the bath house and a doctor was immediately called. According to the' testimony of the keeper of the bath house, when the doctor arrived he. said it was too late to do anything, but nevertheless gave him a hypodermic injection to "try to revive his heart up," as he said. Williams was unconscious and died within five minutes. The doctor was not available to testify, but his statement and report got into the record. In substance, they were that the blood vessels of the man's neck were distended; that he was complaining of intense pain in his heart, and died within a few minutes.

Doctor Foley testified as an expert. He had made a special study of the effect of poisonous gases and went into detail with respect to that subject. Upon a hypothetical question, based upon the facts as asserted by the claimant, the witness expressed the opinion that Williams had died as the result of inhaling the gases from the burning composition on the electric cable.

About a year before his death, Williams and a number of other men had been affected by inhaling similar gases from smoking insulation, but all of them had been revived without any serious disability. On that occasion Williams had also remained in the smoke longer than the other men in smothering out the fire, and he was so affected that he missed a work shift. The other men had suffered brief pain and discomfort. Excepting only this occasion and two others when a child had died and his wife was sick Williams had never missed a

day's work in the seven or eight years he had worked for the company. He was 49 years old and a hard-working man in good health.

The evidence introduced by the employer related to a description of the conditions of the mine at the place and its proper ventilation. A number of witnesses testified to having inhaled similar smoke on other occasions without anything but brief or temporary inconvenience and discomfort until they could get to fresh air. Doctor B. E. Giannini reached the bath house shortly after Williams had died. The other doctor was his assistant. He testified the appearance of the man was "pale and ashen." There were no pink or pinkish spots such as appear when one had died from the effects of carbon monoxide or other poisonous gases. The man's face was covered with coal dust, as is usual with miners at work, but the doctor testified that that condition did not conceal the pallor. Dr. Giannini, upon what he had seen and a hypothetical question embracing the material elements of what the defendant claims to have been proven, expressed the opinion that Williams had died of an attack of angina pectoris, with coronary occlusion. Doctor W. R. Parks, upon the same hypothetical question, also testified that in his opinion the cause of the death was that. These doctors related that when one inhales these gases to the extent that they will produce death, he immediately becomes unconscious and dies before he can be given oxygen, or obtains it naturally from fresh air.

It seems to us quite clear that there is substantial evidence supporting the finding of the Board. The sequence of events and the absence of any claim of previous symptoms of disease of the heart, or any other physical infirmity, are persuasive facts. Over against all this, we have only the fact that the three other men were only temporarily affected and that many others who had inhaled similar gases had survived, and the additional theoretical opinions of the doctors. In turn, they are balanced by the opposite opinion of another doctor.

A matter of practice by the Workmen's Compensation Board is submitted as requiring a reversal of the judgment and a remand of the case. A Referee reported that it was not established that the death of the employee was the result of the smoke and gases, but of a diseased

heart. The Board entered an order referring the record to a disinterested physician, with the request that he examine it and report his opinion to the Board, and the further provision that either party might cross examine the doctor within fifteen days after receipt of a copy of his report. In its findings and opinion, the Board recited:

"After a careful study of briefs of counsel and of the record, including the testimony of those witnesses whose testimony has not been narrated herein, it was our conclusion that the Referee was in error in his finding, but even so it was felt that it would be well to have the benefit of the opinion of some doctor who was entirely removed from the scene of the accident and who had no connection, either directly or indirectly, with any of the parties in interest. Dr. H. C. Salmon, of Ashland, was selected for this purpose. His able, thorough and scholarly opinion, copies of which have been furnished to the interested parties, confirms us in our original view.

"So that it then was, and now is, our opinion that the accident in question and decedent's death are more than a mere coincidence. The sequence of events is such, in the light of the entire record, as to impel to the conclusion that this is a compensable case."

The appellant's criticism of this practice is predicated upon a statement that none of the parties took Dr. Salmon's deposition; that his report is not in the record, and that the opinion of the Board reveals that it had given great weight to that report. The report of Dr. Salmon is in the record. It is very thorough and its analysis and discussion of the technical aspects are quite convincing that the death of the employee was due to the gases. The report of the Board, as quoted, speaks for itself. It is of major importance that the doctor's report was merely confirmatory of a conclusion previously reached by the Board.

The statute authorizes the Board to appoint a disinterested physician to make any necessary medical examination of an injured employee and to testify in respect thereto. KRS 342.315(1). Paragraph 2 of that section authorizes the Board to appoint a permanent medical committee of three physicians to which claims for compensation for disability or death from silicosis shall be referred by the Board, with the provision that

those physicians shall examine the employee and certify their findings to the Board. But there is no statutory authority for the Board otherwise receiving expert advice or the assistance of anyone in reaching its conclusions. We are sure that the motives of the Board were honest and its action was through a desire to find the real facts in order that it would render a just decision.

Our compensation statute, like those of other states, goes far in abolishing the technical rules of trial established by the common law or even by our Code of Practice. But it does not indicate an intent that the elementary and fundamental principles of judicial inquiry should not be observed. While the statute should receive a construction reasonably liberal, we think the evidence should be received by the Board in a manner and form authorized by customary legal procedure, which in this instance, it seems to us, was to direct the taking of the deposition of the neutral physician in the conventional way. Boyer v. Overhead Door Corporation, 107 Ind. App. 679, 26 N. E. 2d 572; Nash v. Solvay Process Company, La. App., 189 So. 493.

It affirmatively appears that the report was not considered in reaching the Board's conclusion in the case and that it was only confirmatory. But in any event, the appellant must be deemed to have waived the irregularity. There was no objection noted of record or later motion to set aside the order or any attempt to cross examine Dr. Salmon after having received a copy of his report. Under these circumstances, we are not disposed to reverse the judgment on this account.

The judgment is affirmed.